**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **CHAD THOMPSON, et al.,** | Case No. 20 CV 02129 |
| Plaintiffs, and | Judge Edmund A. Sargus Jr. |
| **OHIOANS FOR SECURE AND FAIR ELECTIONS, et al.,** | Magistrate Judge Chelsey M. Vascura |
| Plaintiff-Intervenors, | |
| v. | |
| **RICHARD DEWINE, ET AL.,** | |
| Defendants. | |

## INTERVENORS' MOTION FOR TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION

Intervenors Ohioans for Secure and Fair Elections, and the members of its committee, seek to put a voter-initiated issue on the November 2020 ballot; individual intervenors Susan Zeigler, Scott Campbell, Paul Moke, and Andre Washington seek to sign and/or circulate petitions to place the issue on the ballot. The coronavirus pandemic renders it impossible to meet the constitutional and statutory requirements to certify their initiative. Pursuant to the Federal Rules of Civil Procedure 65, Intervenors respectfully request that this Court issue a temporary restraining order and/or preliminary injunction to immediately enjoin the provisions of Ohio law that, as applied in this extraordinary situation, prohibit ballot access to Intervenors, and to order Defendants to provide an alternative avenue for Intervenors to access the ballot. Intervenors move for relief under the First and Fourteenth Amendments to the U.S. Constitution. A Brief in Support of Intervenors' Motion follows.

1

Respectfully submitted,

/s/ *Freda J. Levenson*
Freda J. Levenson (0045916)
*Trial Counsel*
Elizabeth Bonham (0093733)
ACLU of Ohio Foundation
4506 Chester Avenue
Cleveland, Ohio 44103
(216) 472-2220
flevenson@acluohio.org
ebonham@acluohio.org

David J. Carey (0088787)
ACLU of Ohio Foundation
1108 City Park Avenue, Suite 203
Columbus, Ohio 43206
(614) 586-1972
dcarey@acluohio.org

T. Alora Thomas-Lundborg*
Dale Ho*
American Civil Liberties Union
125 Broad Street
New York, NY 10004
Tel: 212-519-7866
Tel: 212-549-2693
athomas@aclu.org
dale.ho@aclu.org
*Pro Hac Vice* Forthcoming

*Attorneys for Intervening Plaintiffs*

## BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION

The coronavirus pandemic is unprecedented. It is a public health nightmare almost beyond imagination, and certainly a disaster on a scale never contemplated by Ohio's legal scheme that regulates ballot access. The petition-signature requirements of the state's initiative process—which would require nearly 700,000 close interpersonal encounters to attain—are now impossible to satisfy. Engaging with Ohio voters in support of the initiative process is "core political speech" involving "interactive communication concerning political change." *Meyer v. Grant*, 486 U.S. 414, 422 (1988). By limiting Plaintiff-Intervenors' ability to engage with Ohio voters to face-to-face communication under these extraordinary circumstances, Ohio is unconstitutionally burdening Intervening-Plaintiffs' rights. Absent court intervention, Intervenors will be denied the constitutional rights to place their proposed constitutional amendment on Ohio's November 2020 ballot.

The coronavirus pandemic has converted Ohio's framework that governs the route of a ballot initiative towards the ballot into an insurmountable barrier. For the scheme requires proponents of a ballot initiative to obtain 442,958 <u>valid</u> signatures (which, in practice, requires obtaining one and a half times that number), in "ink," "personally" witnessed by a petition circulator, and to submit them to Defendant LaRose, the Secretary of State, by July 1. Intervenor-members of the Political Action Committee Ohioans for Secure and Fair Elections ("OSFE") have been working on this issue campaign since fall 2019, have spent significant time and over $500,000 so far, and have successfully complied with the state's initial certification requirements to proceed. Intervenors Sue Zeigler, Scott Campbell, Paul Moke, and Andre Washington are Ohio electors who believe in the issue and very much wish to circulate and/or

1

sign petitions in support of it, and/or recruit others to circulate petitions, but because the coronavirus pandemic makes this activity impossibly dangerous for them and for others, they cannot.

The coronavirus pandemic swept the globe, and into Ohio, in the middle of Intervenors' efforts to secure ballot access. To avoid contracting potentially lethal illness themselves, and in compliance with recommendations and orders, Ohioans are largely staying home and avoiding close proximity to others. But Ohio's initiative and petition laws are premised upon face-to-face encounters: the door-to-door canvasser and the clipboard-holder at the local grocery store are the foundation of signature-gathering campaigns. Suddenly it has become impossible for Ohioans to come within 6 feet of one another without endangering themselves and the public. The thought of holding a pen or touching a paper that fellow petition-signers have touched—or even allowing another person to come into proximity to request a signature—has become repugnant and frightening, and in truth it could be dangerous. In this new reality, there is no possible way for Intervenors to satisfy Ohio's initiative and petition laws in time to access the November ballot.

Ohio's initiative laws contain no emergency valve to deal with any, much less this, unforeseeable situation and preserve the state and federal constitutional rights of Ohioans to put an initiative on the ballot or associate with others who share their political views. According to Defendant LaRose, he "is not free to modify or to refuse to enforce the explicit constitutional and statutory requirements for initiative petition signature gathering, even in the current crisis." Correspondence between Secretary of State's office and OSFE Campaign Director, Mar. 26, 2020, attached as Ex. A. As Defendant LaRose has acknowledged, while some of the requirements could be changed by the General Assembly, "some of the requirements to which you are referring are in Ohio's Constitution which the legislature cannot change on its own." *Id*.

2

Further, an Ohio judge of a County Court of Common Pleas has recently found that he too lacks jurisdiction to determine whether Ohio's Constitution violates Intervening Plaintiffs' federal constitutional rights. *Ohioans for Raising the Wage v. LaRose*, No. 20-CV-2381, at 7 (Ohio Com. Pl., Apr. 28, 2020). "[F]ederal court's 'obligation' to hear and decide a case is 'virtually unflagging.'" *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 134 S. Ct. 584, 187 L. Ed. 2d 505 (2013) (citations omitted).  Intervenors seek an injunction from this Court to hold the now-burdensome initiative laws unconstitutional as applied in this most extraordinary of situations to their attempt to secure a place on the November 2020 ballot.

## I.    STATEMENT OF FACTS

The goal of OSFE is to place a proposed state constitutional amendment on the November 3, 2020 ballot that would protect and expand the voting rights of Ohioans and ensure that voting in Ohio elections remains secure. Since the fall of 2019, OSFE has been building and advancing its campaign in support of this issue and it has already fulfilled the requirements for ballot access just up to the point of circulating petitions to meet the petition signature requirement. Webb Decl., attached as Ex. B at ¶ 4-5. OSFE has spent in excess of $500,000 on its campaign. *Id.* at ¶ 19. Between December 2019 and February 2020, OSFE gathered over 1,000 signatures from qualified electors in Ohio in support of its proposed amendment, and the Attorney General certified it. On March 2, 2020, the Ohio Ballot Board attempted to split the proposed amendment into separate propositions.  Three days later OSFE filed emergency litigation to keep its measure unified. On April 14, 2020 the Ohio Supreme Court found that the Proposed Amendment was a single issue and ordered the Ballot Board to meet and certify it as such.  On April 23, the Ballot Board met and certified the Proposed Amendment as a single issue.

Sue Ziegler, Scott Campbell, Paul Moke, and Andre Washington are Ohioans who care deeply about the voting rights reforms that OSFE seek to place into their state's constitution, and they have planned to support the ballot measure.

Ms. Zeigler is a resident of Avon Lake, Ohio who has followed the OSFE campaign and wants to sign its petition. But she now needs to remain at home in self-isolation—she has even stopped her regular volunteer work as a hospice worker to avoid transmitting or contracting the virus, and she would be afraid to "touch a petition circulator's pen or paper even with the proverbial ten foot pole." Zeigler Decl., attached as Ex. C at ¶ 8.

Mr. Campbell is a resident of Cleveland Heights, Ohio who is passionate about voting rights and ballot access in Ohio. After learning about the OSFE petition, he wanted to sign it to advance a cause he cares about. But because of the coronavirus, he needs to stay at home and avoid contact with others, and if a petition circulator came to his door, he would not feel safe signing the petition. Campbell Decl., attached as Ex. D at ¶ 13.

Mr. Moke is a resident of Wilmington, Ohio who wants to circulate the OSFE petition. Mr. Moke is a law and political science professor who has devoted much of his professional focus on supporting voting rights. Despite his deep desire to circulate petitions to pass OSFE's ballot initiative and recruit others to do the same, Mr. Moke will not, due to his fear of contracting coronavirus and his conviction that he must adhere to public health recommendations to stay at home. Moke Decl., attached as Ex. E at ¶ 17, 19.

Mr. Washington is a Delaware, Ohio resident and lifelong voting rights advocate. He is the President of the Ohio A. Philip Randolph Institute, a statewide voting rights organizing group, as well as an officer of the Ohio Conference of the NAACP. With both groups, and in all of his spare time, he devotes himself to mobilizing his community around voting rights reform.

He had intended to circulate petitions himself, and also to recruit and organize members of his organizations to circulate petitions. But because of the pandemic, he will neither be able to circulate his own petition, nor does he feel it ethical, or even possible, to ask his membership to do so, due to the health and safety concerns. Washington Decl., attached as Ex. F at ¶14-18.

The coronavirus pandemic struck just as Intervenors are poised to begin the collection of the approximately 675,000 signatures required, as a practical matter, to put their proposed amendment on the ballot. *See* Ex. B at ¶ 4, 7. But the epidemic has precluded the person-to-person contact that Ohio's signature requirements require. In the face of the epidemic, the key guidance issued by the World Health Organization, the Center for Disease Control, state and local governments, health experts, and scientists has been for every person to maintain social distance, to avoid gatherings, to stay at home, and isolate those who have symptoms by avoiding contact with others at all costs. *See, e.g.* Reingold Decl., attached as Ex. G at ¶ 10-11.  Ohio issued a stay-home order that banned gatherings and ordered the closure of non-essential businesses and public places, including restaurants, shops, and playgrounds. Nonessential businesses and classrooms have all switched to remote work; and public events, including festivals and Ohio's primary election, were delayed, made remote, or both.

Despite this radically changed reality, Ohio's petition and initiative laws remain. To circulate a petition to place a proposed amendment onto the ballot, Ohio's constitution and statutes comprise a framework of rules that necessitates in person, face-to-face signature gathering—without exception. For example, the law requires: signature gathering of at least 10% of the total vote cast for governor in the last gubernatorial election, *see* Ohio Const. Art. II § 1a; R.C. 3519.14; that the signatures gathered include at least 5% of the most recent vote for governor in at least 44 of Ohio's 88 counties; *see* Ohio Const. Art. II § 1g; R.C. 3519.14; that

these signatures are affixed *in ink*, *see* Ohio Const. Art. II § 1g; R.C. 3501.38(B); that the signatures may not be made by proxy, R.C. 3501.38; Ohio Const. Art. II § 1g; and that the signatures be *personally witnessed* and attested by the petition's circulator. Ohio Const. Art. II § 1g.

The signature collection scheme required to support a ballot measure campaign is simply not possible in the coronavirus pandemic. Petition circulators depend on mass gatherings to interact with individuals and spread their message: they need to walk through a college green, stand outside a public library, and set up tables at festivals. They can perform their function only if they have the ability to interact with others. Ohio's ballot access system, one that requires a high number of signatures to be obtained before July 1 and requires that these be personally witnessed and in ink, has become untenable. Compliance with Ohio's petition and initiative law during the pandemic is impossible.

Of course, this unprecedented pandemic has interfered with elections and petitions in other states as well. Other jurisdictions have also had to preserve and protect peoples' rights in unprecedented ways. On March 25, a Virginia state court suspended that state's numeric signature requirement, allowing a Republican senate candidate ballot access because petition circulation was impossible. Order, attached as Ex. H Similarly, recently federal courts in Illinois and Michigan and a state court in Massachusetts have changed ballot access requirements in light of COVID-19. *Libertarian Party of Illinois v. Pritzker*, 2020 WL 1951687, at *4 (N.D. Ill., Apr. 23, 2020); *Esshaki v. Whitmer*, No. 2:20-CV-10831-TGB, 2020 WL 1910154, at *10 (E.D. Mich., Apr. 20, 2020); *Goldstein v. Sec'y of Commonwealth*, No. SJC-12931, 2020 WL 1903931, at *6 (Mass., Apr. 17, 2020). An Ohio state court has determined that it lacks the jurisdiction to determine whether the provision of the Ohio constitution violate the First and Fourteenth Amendments.

6

*Ohioans for Raising the Wage v. LaRose*, No. 20-CV-2381, at 7 (Ohio Com. Pl., Apr. 28, 2020). The only recourse is for this Court to act.

## II.     STANDARD OF REVIEW

On a motion for a preliminary injunction, this Court balances four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross & Blue Shield Ass'n*, 110 F.3d 318, 322 (6th Cir. 1997). The balance here favors a preliminary injunction.

## III.     ARGUMENT

### A.  Intervenors Are Likely to Succeed on The Merits of Their Claims

Intervenors challenge the Ohio petition and initiative laws summarized above, which, as applied to them in these exceptional circumstances, constitute a ban on their access to the ballot and their ability to meaningfully associate with others in support of their ballot proposal. Without any provision to accommodate a reality where petition circulators and potential signatories must remain isolated indoors, Ohio's laws make the ability to propose an amendment by initiative merely theoretical--and unattainable. This implicates Intervenors' core First and Fourteenth Amendment rights to access the ballot, freedom of speech, and freedom of association.

Ohio's constitution has enshrined a right to initiative, and once a state creates such a right, it may not restrict it in a way that unduly burdens First Amendment rights. *See Meyer v. Grant*, 486 U.S. 414, 424-28, 108 S. Ct. 1886, 100 L. Ed. 2d 425 (1988); *see also Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 295 (6th Cir. 1993) ("although the Constitution does not require a state to create an initiative procedure, if it creates such a

7

procedure, the state cannot place restrictions on its use."). In Ohio, "the people's right to the use of the initiative and referendum is one of the most essential safeguards to representative government." *State ex rel. Nolan v. ClenDening*, 93 Ohio St. 264, 277, 112 N.E. 1029 (1915). The initiative right must be "liberally construed to effectuate the rights" of Ohioans. *State ex rel. Hodges v. Taft*, 64 Ohio St. 3d 1, 5, 591 N.E.2d 1186 (1992).

> **1.    Ohio's petition requirements severely burden Intervenors' freedom of speech rights under *Meyer v. Grant*.**

As the circulation of petitions involves "both the expression of a desire for political change and a discussion of the merits of the proposed change," it is "core political speech." *Meyer*, 486 U.S. at 421-22. Intervenors are engaged in protected speech when they advocate for their ballot initiative and garner support through signature-gathering. The State, however is "restrict[ing] political expression … [by] limiting their ability to make the matter the focus of statewide discussion." *Id.* at 423. "The rights of political association and free speech" that are implicated here "occupy a … hallowed place in the constitutional pantheon." *Libertarian Party of Ohio v. Blackwell,* 462 F.3d 579, 585 (6th Cir. 2006) (citing *Cal. Democratic Party,* 530 U.S. at 574). These rights are at "the core of the protection afforded by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995).

In the extraordinary circumstances of this moment, that process is effectively banned in Ohio. Circulators cannot safely gather signatures in person in the midst of a pandemic without endangering their own and others' health. Since Ohio law prohibits other forms of signature collection, Plaintiffs' and Intervenors' core political speech through that vector is altogether suppressed, undercutting the petition right that the state created in the first place. *See id.*; *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 723 (M.D. Tenn. 2019) (*Meyer* "explicitly

rejected … the argument that the logistical aspects of collecting signatures could be easily separated from the regulation of speech[.]").As explained in *Schmitt v. LaRose*, states regulate core political speech where they restrict the "ability to advocate for" initiative petitions. 933 F.3d 628, 644 (6th Cir. 2019) (Bush, J., concurring) (citing *Meyer*). Eliminating an entire manner of political communication certainly meets that description, and so runs directly afoul of First Amendment protections. *See also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995) (ban on leaflets "does not control the mechanics of the electoral process," but rather "is a regulation of pure speech").

As applied to Intervenors in these unprecedented and extreme circumstances, the challenged legal scheme completely "restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication." *Meyer*, 486 U.S. at 424.  Such a draconian limitation on expression must face exacting scrutiny. *Meyer*, 486 U.S. at 420; cf. *Buckley v. Am. Constitutional Law Found., Inc.,* 525 U.S. 182, 192, 119 S. Ct. 636, 142 L. Ed. 2d 599 (1999) (heightened scrutiny applies to regulations that "significantly inhibit communication with voters about proposed political change.").  Under *Meyer*, the State's interest is only justified if it is "necessary," meaning there are no other means by which it can be met. *Meyer*, 486 U.S at 426.  The State's action cannot meet this standard.

> **2.     Ohio's petition requirements also burden Intervening-Plaintiffs ballot access and freedom of association rights under Anderson-Burdick.**

Even assuming this Court finds that the Anderson-Burdick framework is the appropriate framework from which to judge constitutional injury to Intervening-Plaintiffs, they would be likely to succeed on the merits.  "Under the three-step *Anderson-Burdick* framework, we "weigh the character and magnitude of the burden the State's rule imposes on [Plaintiffs' First Amendment] rights against the interests the State contends justify that burden, and consider the extent to which

the State's concerns make the burden necessary." *Schmitt*, 933 F.3d at 639. The burden on Intervenors' core rights presented here is severe because: "[t]he hallmark of a severe burden is exclusion or virtual exclusion from the ballot." *Schmitt*, 933 F.3d at 639 (citing *Libertarian Party of Kentucky v. Grimes*, 835 F.3d 570, 574 (6th Cir. 2016)); *see also Williams v. Rhodes*, 393 U.S. 23, 24, 35, (1968) (striking "series of election laws," including requirement that minor political parties file a petition signed by the number of voters equal to fifteen percent of the votes cast in the preceding gubernatorial election, because it "made it virtually impossible" for any party other than the Republican Party and Democratic Party to gain ballot access). Such severe burdens should be subject to strict scrutiny. *Cf. Cal. Democratic Party*, 530 U.S. at 582 (severe burdens on associational rights trigger strict scrutiny). At a minimum, the unprecedented circumstances and the resulting effect on petition gathering should trigger heightened scrutiny. Courts including the United States Supreme Court, the Sixth Circuit and federal district courts in Ohio have found that heightened scrutiny should apply under such circumstances given the burden on Plaintiff Intervenors' rights. *Cf. Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 592-93 (6th Cir. 2012) (applying heightened to equal protection challenge to elections regulations); *Obama for Am. v. Husted*, 697 F.3d 423, 434 (6th Cir. 2012) (same).

Here, Intervenors are faced not with a mere regulation of *how they may* access the ballot, but what amounts to a *ban* on ballot access, and on their related speech and association rights. The kind to face to face, close proximity interactions between strangers, and mass public gathering necessary to obtain ink signatures are still impossible. *See* Camryn Justice, Reopening Ohio: Gov. DeWine gives dates, protocols for reopening businesses beginning May 1, News 5 Cleveland, Apr. 27, 2020, https://www.news5cleveland.com/news/continuing-coverage/coronavirus/reopening-ohio-gov-dewine-gives-dates-protocols-for-reopening-

businesses-beginning-may-1 (describing the regulations that remain in place including requiring six feet of distance between individuals in restaurants and other public establishments).  OSFE has no hope of meeting Ohio's requirements. Other courts have found that under such circumstances, plaintiffs face a severe burden. *Esshaki v. Whitmer*, No. 2:20-CV-10831-TGB, 2020 WL 1910154, at *6 (E.D. Mich. Apr. 20, 2020) (finding "a severe burden on Plaintiff's exercise of his free speech and free association rights under the First Amendment" in light of COVID-19 and that "a strict scrutiny analysis is appropriate here.");  *Goldstein v. Sec'y of Commonwealth*, No. SJC-12931, 2020 WL 1903931, at *6 (Mass. Apr. 17, 2020) (holding that the  minimum signature requirement though modest in "ordinary times" is "severe burden" in light of COVID-19); *see also Libertarian Party of Illinois v. Pritzker*, No. 20-CV-2112, 2020 WL 1951687, at *4 (N.D. Ill. Apr. 23, 2020) (finding that the ballot access requirements are a "nearly insurmountable hurdle" in light of COVID-19).

### 3.     Ohio's petition requirements are not necessary nor are they tailored to meet *any* State interest.

By contrast, Defendants have no compelling interest—indeed, no interest at all—in a total prohibition of Intervenors' ability to associate or access the ballot, which is what maintaining the current legal framework amounts to. Similarly, a legal scheme that creates such a ban without any exception is not necessary nor can it be narrowly tailored to serve any interest. The state's typical interests such as a simplified ballot, avoidance of voter confusion, ensuring grass roots support, *Blackwell*, 462 F.3d at 594 and its interests in "protect[ing] the integrity and reliability of the initiative process," *Buckley*, 525 U.S. at 191 are actually *undermined* here, where disorder already abounds, and where without relief, there will be no campaigns to regulate. The current regime cannot be considered sufficiently tailored to meet these interests.

Intervenors' proposed remedies would not lead to a complicated or confusing ballot. Intervenors have requested two alternative remedies relating to signature-gathering: (1) that the initiative be placed on the ballot without the need of further signatures given the 1,000 initial signatures already gathered and the certification by the Attorney General, or (2) the allowance of electronic signatures, to be gathered up till August 21, 2020 with no geographic distribution requirements and the number of required signatures reduced by 50%. Compl. 25-26. As noted above, Intervenors bring an as-applied challenge only. *See id.* (requesting that ballot initiative restrictions "as applied to Intervenors and the petition for the Proposed Amendment" be lifted in light of COVID-19). Even if the Court were to apply its order more broadly beyond the Intervening-Plaintiffs, the application would be sharply limited. Any campaign will still need to expend significant funds and effort to garner the necessary electronic signatures. Moreover, if this Court were to order that Intervening-Plaintiffs, and the two other proposed constitutional amendments certified by the Attorney General prior to the COVID-19 outbreak be placed on the ballot, it would result in a maximum of only three constitutional amendments on the November 2020 ballot.[1] Ohio has frequently had three or more issues on the ballot in the past.[2] Ohio voters have been able to successfully exercise their right to vote without confusion with multiple issues on the ballot. It is certainly not necessary that the State prevent Intervenors from being on the

---

[1] Only three constitutional amendments to date have been certified by the Attorney General. *See* Dave Yost, Ohio Attorney General, *List of petitions submitted to the Attorney General's Office*, https://www.ohioattorneygeneral.gov/Legal/Ballot-Initiatives/Petitions-Submitted-to-the-Attorney-General-s-Offi (accessed Apr. 16, 2020).

[2] For example, in the past 20 years Ohio had three issues on the ballot in 2015, 2011, 2009, including three constitutional amendments in 2009, and more than four issues on the ballot in 2008, 2006, and 2005, including three constitutional amendments in 2008 and 2006. *See* Frank LaRose, Ohio Secretary of State, *Statewide Issue History*, https://www.sos.state.oh.us/elections/election-results-and-data/historical-election-comparisons/statewide-issue-history/ (accessed Apr, 30, 2020).

ballot to facilitate a simple ballot and ease voter confusion. *See Blackwell*, 462 F.3d at 594 (holding that the state's interest to "avoid voter confusion" was not sufficient since the state "put forth no evidence" supporting how the provisions would support this interest).

The State interest of ensuring grassroots support does not justify a wholesale obstruction of Intervenors' initiatives. *Meyer*, 486 U.S. at 425 (finding that the State's "interest in making sure that an initiative has sufficient grass roots support to be placed on the ballot" was not sufficient to warrant the burden on the plaintiffs' right); *see also Blackwell*, 462 F.3d at 594 (holding that State's interest in determining "bona fide support" was insufficient); *Libertarian Party of Ohio v. Brunner*, 567 F. Supp. 2d 1006, 1014 (S.D. Ohio 2008) (same). The State must show that the current requirements are narrowly tailored toward meeting this interest, which it cannot do. *Esshaki v. Whitmer*, No. 2:20-CV-10831-TGB, 2020 WL 1910154, at *7 (E.D. Mich. Apr. 20, 2020) (holding that "a state action narrowly tailored to accomplish the same compelling state interest" and "even assuming the State generally has a compelling interest in ensuring candidates have a modicum of support before allowing inclusion on the ballot, here the State has not shown it has a compelling interest in enforcing *the specific numerical requirements* set forth"). Grassroots could be achieved through the gathering of electronic rather than paper signatures. Just as with Ohio's current system of online voter registration, the electronic petitioner signer's identity can be verified through the provision of personally identifying information to ensure that only Ohio electors sign the Proposed Amendment. Further, Defendants cannot demonstrate Intervenors have already demonstrated a minimum level of grassroots support through the gathering of signatures to send their proposed constitutional amendment to the Attorney General for certification.

Nor can the state demonstrate how allowing the modification of Ohio's procedures only for the November 2020 election will result in a loss to the integrity of the electoral system. COVID-19 has resulted in many changes, hopefully many of them temporary, to the way in which elections have been conducted, not only in Ohio, but around the country. The remedies proposed by Intervenors provide for verification of each signer's identity. In the case of electronic signatures, personally identifying information would be provided to the Secretary of State for verification, similar to the information that is provided for Ohio's existing system of electronic voter registration. If the Court agrees to certify the Proposed Amendment based on the already collected signatures, those have already been collected in ink and verified.

There is no reason to believe that more fraud is likely, especially given the law in place making fraud in this context illegal. In *Meyer* the court found that Colorado had sufficient other provisions on its books to prevent the "pad[ding of] their petitions with false signatures." *Meyer v. Grant*, 486 U.S. 414, 427 (1988). Like in *Meyer*, Ohio has numerous statutes that penalize false signatures in this context. *See* R.C. 3599.13(7) (imposing a fine or imprisonment for false signatures on petitions); R.C. 3599.14 (making it illegal to knowingly "[c]irculate or cause to be circulated the petition or declaration knowing it to contain false, forged, or fictitious names" or "[m]ake a false certification or statement concerning the petition or declaration"); R.C. 3599.28 (making it illegal for any person, with intent to defraud or deceive, to write or sign the name of another person to any document, petition, registration card, or other book or record). Integrity of the electoral system is not necessary and does not warrant the restriction on Intervenors' rights. *See Meyer*, 486 U.S.at 426, (holding that "protecting the integrity of the initiative process does not justify" the burden on the plaintiffs' rights).

14

**4. Given the extraordinary situation, the Court's modification of the signatory requirements is the only means by which Intervenors' rights can be protected.**

When the "Ohio General Assembly has failed to prescribe constitutional ballot access requirements," or "where a state has unconstitutionally prevented a party or candidate from accessing the ballot," the federal courts must devise a remedy. *Libertarian Party of Ohio v. Brunner,* 567 F.Supp.2d 1006, 1015 (S.D. Ohio 2008) (taking judicial notice of "requisite community support" to place minor party on ballot when Ohio elections regulations foreclosed ballot access). In the context of elections emergencies such as this, "[w]hen state laws are inadequate or no applicable laws exist, courts are often asked to step in on a largely ad hoc basis as a constitutional matter and craft remedies out of whole cloth." Michael T. Morley, *Election Emergencies: Voting in the Wake of Natural Disasters and Terrorist Attacks*, 67 Emory L.J. 545, 550 (2018).

There have been a string of cases in the last month modifying ballot access requirements in light of COVID-19. Injunctive relief in the context of a forthcoming election is an equitable—and unusual—remedy, but it is not unprecedented. In fact, at least one state court has already entered a preliminary injunction reducing a state statutory signature requirement because of the burdens put on candidates by the COVID-19 pandemic. *Esshaki v. Whitmer*, No. 2:20-CV-10831-TGB, 2020 WL 1910154, at *10 (E.D. Mich. Apr. 20, 2020) (holding that it was "appropriate to enjoin Defendants from rigid application" of the ballot access requirements because it would cause "irreparable harm"); *Goldstein v. Sec'y of Commonwealth*, No. SJC-12931, 2020 WL 1903931, at *6 (Mass. Apr. 17, 2020) (holding that the minimum signature requirement and the need to provide "wet signatures" "which may only impose a modest burden on candidates in ordinary times, now impose a severe burden on, or significant interference with, a candidate's right to gain access to the . . . primary ballot, and the government has not advanced a compelling interest"); *Faulkner v.*

*Va. Dep't. of Elections*, CL 20-1456 (Va. Cir. Ct. Mar. 25, 2020) (granting preliminary injunction and reducing candidate signature gathering requirements because of state's COVID-19 restrictions).  Just last week in *Libertarian Party of Illinois v. Pritzker*, 2020 WL 1951687 (N.D. Ill., Apr. 23, 2020), a Court reduced Illinois's statutory signature requirements for all candidates to 10 percent of previous levels, extended their filing deadlines from June 22, 2020 until August 7, 2020, enjoined Illinois's in-person, witnessed, wet and notarized signature collection process in order to allow the electronic dissemination and collection of supporting signatures, and even directly placed on Illinois's ballots the candidates of the Libertarian and Green Parties in contests where the two parties had previously placed candidates in earlier elections

Further, there is precedent in the state and federal courts for modifying signature requirements, time limits, and other regulations to allow ballot access where it would otherwise be impossible, even outside of the COVID-19 pandemic. *See, e.g. State ex rel. Ohio AFL-CIO v. Voinovich*, 69 Ohio St. 3d 225, 236–37, 631 N.E.2d 582 (1994), *opinion clarified*, 69 Ohio St. 3d 1208, 632 N.E.2d 907 (1994) (extending the period for signature gathering by 90 days for a petition for referendum); *State ex rel. LetOhioVote.org v. Brunner*, 123 Ohio St. 3d 322, 2009-Ohio-4900, 916 N.E.2d 462, ¶ 54 (same); *see also State ex rel. Ohio Liberty Council v. Brunner*, 125 Ohio St. 3d 315, 2010-Ohio-1845, 928 N.E.2d 410, ¶ 62 (recognizing "exten[sion of] the constitutional deadline" for submitting a petition is an appropriate remedy); *cf. Blackwell,* 462 F.3d at 595 ("moving the filing deadline" for petition was appropriate remedy in party ballot access case); *Brunner,* 567 F.Supp.2d at 1015-16 (placing party on ballot was appropriate remedy in party ballot access case).

COVID-19 is not the first time that courts have provided relief in the context of emergency situations affecting ballot access and voting rights more broadly. *See Fla. Democratic*

*Party v. Scott,* 215 F. Supp. 3d 1250, 1257 (N.D. Fla. 2016). Where state executives have not

acted to preserve voting and other First Amendment rights during times of emergency, the state

and federal courts have had to do so. *See, e.g. Georgia Coal. for the Peoples' Agenda, Inc. v.*

*Deal,* 214 F. Supp. 3d 1344, 1345 (S.D. Ga. 2016) ("What is clear to the Court, [], is that

granting the extension [of voter registration] would have been the right thing to do. The Court

does not discount that the extension would present some administrative difficulty. However,

those administrative hurdles pale in comparison to the physical, emotional, and financial strain

Chatham County residents faced in the aftermath of Hurricane Matthew"); *State v. Marcotte,* 148

Me. 45, 53–54, 89 A.2d 308 (Me. 1952) (upholding the validity of delayed election because of

extraordinary storm; "[t]here was a storm of such unusual proportions and such unexpected

violence that it might well be considered that there was no election due to 'an act of God.'");

Order, *Ertel v. Essex Cty. Bd. Of Elections,* N.J. Super. Ct. Law Div. (Nov. 7, 2012) at ¶4-5

*available at* https://www.aclu-nj.org/download_file/view_inline/1002/841 (ordering expanded

acceptance of late requests for absentee ballots in the election immediately following Hurricane

Sandy); *see also Obama for America v. Cuyahoga County Board of Elections,* N.D. Ohio No.

1:08-cv-562 (Mar. 4, 2008) (same day action to keep polls open an extra 1.5 hours because of

bad weather and ballot shortage); *Ohio Democratic Party v. Cuyahoga County Board of*

*Elections,* N.D. Ohio No. 1:06-cv-2692 (Nov. 7, 2006) (same day action to keep polls open an

extra 1.5 hours because of reports that polling locations had opened late and had faulty

equipment; injunction granted as to 16 individual polling places).

In this extraordinary situation, where the challenged elections laws will nullify

Intervenors' constitutional rights, no government interest can justify a refusal to provide

Intervenors *some* avenue to association and ballot access. In First Amendment cases "the

likelihood of success on the merits often will be the determinative factor" in whether to grant a preliminary injunction. *Connection Distrib. Co. v. Reno,* 154 F.3d 281, 288 (6th Cir. 1998). The Intervenors are likely to succeed.

### B. The Intervenors Will Suffer Irreparable Harm Without the Ability to Get on This Ballot

"When constitutional rights are threatened or impaired, irreparable injury is presumed." *Obama for Am. v. Husted,* 697 F.3d at 436 (citation omitted); *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury") (citation omitted).

Intervenors here face "exclusion from the ballot," the "hallmark of a severe burden" to their constitutional rights. *Grimes,* 835 F.3d at 574. Without some modification to the laws they challenge, as a practical matter they are totally disabled from exercising their rights to ballot access or associating to circulate their petition in the any of the ways that Ohio's framework allows. In addition to the frustration of Intervenors' constitutional rights, they will suffer material consequences if their ballot measure campaign must suddenly halt. OSFE has already committed its staff and volunteer base's time and energy for months, not to mention over half a million dollars spent, to promote this issue in which all of its supporters deeply believe. Maintaining the current initiative and petition regulations without an emergency exception renders the OSFE Intervenors' rights to ballot access and to association meaningless, wastes the time and money they spent on their campaign to date, and requires them to repeat the steps they have already taken—the collection of 1,000 signatures, certification by the Attorney General, review by the Ballot Board and resulting litigation before the Ohio Supreme Court, as well as massive staff organizing and training efforts—in an unknown future election when they may not have the resources to do so.

18

The Intervenors who are would-be signers and circulators cannot wait until some later time, possibly never to come, to exercise their fundamental rights. Intervenors, believing that the election reforms proposed in their ballot measure are already overdue, strive to have their initiative placed before voters in 2020, and not in some future election, and they have invested time and funds accordingly.

### C. The Public Interest and the Lack of Harm to Others Favor a Preliminary Injunction

"It is always in the public interest to prevent the violation of a party's constitutional rights." *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 412 (6th Cir. 2014) (quotation omitted). The lack of an emergency exception to Ohio's initiative and petition requirements, in these circumstances, acts as a total ban on Intervenors' constitutionally-guaranteed rights.

Prior litigation in emergency situations also demonstrates that, in practice, litigation of this type serves the public. For example, in New Jersey after an anthrax attack the court allowed absentee ballots to be counted after Election Day. *In re Holmes*, 346 N.J.Super 372, 378, 788 A.2d 291 (N.J. App. 2002). There the court found that the "rigid application of the rule that all ballots be received by the board by 8:00 P.M. of Election Day would unfairly deprive absentee voters of their franchise as a result of exceptional circumstances neither within their control nor which, in light of human experience, might reasonably be expected." *Id.* at 378. Here, not just Intervenors, but the public, has been universally impacted by this crisis, and would benefit from this Court's intervention to preserve the constitutional right to access the ballot.

In addition to the Intervenors themselves, there are thousands of Ohioans whose support for OSFE's ballot issue will be stifled without the Court's intervention. At least 1,000 members of the public have already supported this ballot initiative, and Intervenors had been mobilizing many more individuals and groups. Without a remedy, the right of initiative will be lost to all during this

election cycle, because Ohio's laws are unconstitutional as applied to Intervenors and similarly situated groups under these novel circumstances. Even assuming that the State were to suffer some additional burden in modifying the ballot access requirements for the November 2020 ballot, this burden is outweighed by the burden on Intervening-Plaintiffs and the public. *Libertarian Party of Illinois v. Pritzker*, No. 20-CV-2112, 2020 WL 1951687, at *4 (N.D. Ill. Apr. 23, 2020) ("The court recognizes that the state will be burdened by extending the signature-gathering deadline, but finds this hardship outweighed by the significant difficulties that would be experienced by campaigns trying to implement a new signature-gathering process while complying with even the modified statutory requirements in such a short amount of time.").

The nature of Intervenors' request for relief is strictly limited and applies only to garnering access to the November 2020 ballot during the current coronavirus pandemic.

## V. CONCLUSION

For the foregoing reasons, Intervenors respectfully request that this Court issue a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65, to enjoin Defendant from enforcing the above-listed initiative requirements as to Intervenors in advance of the November, 2020 election, and to further enjoin Defendants to provide Intervenors the alternative processes sought in their Complaint, to allow them to access the ballot in November 2020.

April 30, 2020

Respectfully submitted,

/s/ *Freda J. Levenson*
Freda J. Levenson (0045916)
*Trial Counsel*
Elizabeth Bonham (0093733)
ACLU of Ohio Foundation
4506 Chester Avenue
Cleveland, Ohio 44103
(216) 472-2220

20

flevenson@acluohio.org
ebonham@acluohio.org

David J. Carey (0088787)
ACLU of Ohio Foundation
1108 City Park Avenue, Suite 203
Columbus, Ohio 43206
(614) 586-1972
dcarey@acluohio.org

T. Alora Thomas-Lundborg*
Dale Ho*
American Civil Liberties Union
125 Broad Street
New York, NY 10004
Tel: 212-519-7866
Tel: 212-549-2693
athomas@aclu.org
dale.ho@aclu.org
*Pro Hac Vice Forthcoming

*Attorneys for Intervening Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2020, I filed a copy of the foregoing Motion and Brief in Support using the Court's Electronic Filing System, and that counsel for all parties received electronic notice through that system.

/s/ *Freda J. Levenson*
Freda J. Levenson