**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**CHAD THOMPSON, et al.,**

      **Plaintiffs,**

        **v.**

**GOVERNOR OF OHIO
MICHAEL DEWINE, et al.,**

      **Defendants.**

        **CASE No. 2:20-CV-2129
        JUDGE EDMUND A. SARGUS, JR.
        Magistrate Judge Chelsea M. Vascura**

## OPINION AND ORDER

The instant matter is before the Court for consideration of three Applications for a Temporary Restraining Order and/or three Motions for Preliminary Injunction filed by each of the groups of Plaintiffs in this matter. (ECF Nos. 4, 15, 17-2.) The Court held several telephone conferences with the parties, who unanimously indicated that they did not need an evidentiary hearing, instead requesting that the Court rely on their agreed stipulated facts, their non-contested affidavits, and their briefing. Defendants filed their Memorandum in Opposition (ECF No. 40) and Plaintiffs filed their Replies (ECF Nos. 41, 42, 43).  For the reasons set forth below, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motions.

**I.**

Plaintiffs Chad Thompson, William Schmitt and Don Keeney ("Thompson Plaintiffs"), Plaintiff-Intervenor Ohioans for Safe and Secure Elections and their supporters ("OFSE Plaintiffs"), and Plaintiff-Intervenor Ohioans for Raising the Wage and their supporters ("OFRW Plaintiffs") (together "Plaintiffs"), seek to place proposed local initiatives and constitutional amendments on the November 3, 2020 general election ballot.

The Ohio Constitution provides state electors the right to amend the Ohio Constitution and legislate through initiative and referendum. The Ohio Constitution and various statutes set forth a number of formal requirements for qualifying on the ballot, including a total number of signatures required, a geographic distribution of signers, requirements that petitions must be signed in ink, must be witnessed by the petition circulator, and may not be made by proxy, together with deadlines for submission to the Secretary of State or local officials.

While Plaintiffs were advancing their petitions for the November 3, 2020 general election, the world was stunned by the advent of Coronavirus Disease ("COVID-19"), a highly contagious respiratory virus. The virus has spread throughout the world like wildfire quickly rising to the level of a global pandemic that has posed a significant threat to the safety of all people. In an effort to respond rapidly to this threat, Ohio Governor Mike DeWine, in Executive Order 2020-01D, authorized Ohio Department of Health Director Amy Acton, M.D., to formulate general treatment guidelines to curtail the spread of COVID-19 in Ohio. In accordance with Governor DeWine's Executive Order, Dr. Acton issued several Director's Orders, one of which required all individuals living in Ohio to stay home beginning March 22, 2020 subject to certain exceptions.

According to Plaintiffs, Ohio's enforcement of several signature requirements in light of the ongoing COVID-19 pandemic and Ohio's responding Stay-at-Home orders, make it impossible to qualify their constitutional amendments and initiatives for the November ballot. Plaintiffs Thompson, Schmitt, and Keeley seek an order directing Defendants to either place their marijuana decriminalization initiatives on local ballots, or in the alternative, to enjoin or modify the requirements for qualifying initiatives for the November ballot in light of the public health emergency caused by COVID-19 and Ohio's emergency orders that were issued in response. OFSE and OFRW and their supporters similarly seek orders placing their proposed constitutional

amendments on the November ballot or modification of the requirements for qualifying their proposal amendments for the ballot.

Although Plaintiffs seek place to place different local initiatives and constitutional amendments on the November ballot, the key issue is the same: whether Ohio's strict enforcement of its requirements for placing local initiatives and constitutional amendments on the ballot unconstitutionally burden Plaintiffs' First Amendment rights in light of the ongoing pandemic and Ohio's emergency orders.

## II.

### A.    Ohio's Initiative Procedure

An initiative is a method of direct democracy whereby the people enact laws or adopt constitutional amendments without reliance upon the legislature. *See generally Pfeifer v. Graves,* 88 Ohio St. 473 (1913). The Ohio Constitution reserves to Ohioans the right to engage in direct democracy through the advancement of initiative petitions. Ohio Const., Art. II, § 1a & 1f. The Ohio Constitution empowers Ohioans to advances initiative petitions for local ordinances and measures as well as for constitutional amendments.

### 1.  Initiative Procedure for Constitutional Amendments

Article II, § 1 of the Ohio Constitution empowers Ohioans to "propose amendments to the constitution and to adopt or reject the same at the polls" independent of the Ohio legislature. Ohio Const., Art. II, § 1. Ohio Revised Code § 3519.01 requires anyone who seeks to propose an Ohio constitutional amendment via initiative petition to submit a summary of the amendment along with the signatures of one thousand qualified electors to the attorney general for certification. If the attorney general determines that the summary is fair and truthful within ten days of receiving the initiative petition, then the attorney general must send the initiative petition to the Ohio Ballot

Board. Ohio Rev. Code § 3519.01(A). Within ten days of receiving the proposed amendment, the Board must determine whether the it contains only one proposed law or amendment. Ohio Rev. Code § 3505.062(A).

If both the attorney general and the Board certify the petition, then the attorney general is directed to file with the secretary of state "a verified copy of the proposed law or constitutional amendment together with its summary and the attorney general's certification." Ohio Rev. Code § 3505.062(A) & § 3519.01. Once this process is complete, the Ohio law permits the proponents of the constitutional amendment to acquire signatures to support its placement on the ballot. *Id.*

The Ohio Constitution requires an initiative petition for a proposed constitutional amendment to be signed by ten percent of the electors of the state who voted in the last gubernatorial election. Ohio Const. Art. II, § 1a; Ohio Rev Code § 3519.14 (Secretary of State shall not accept any petition which does not purport to contain the minimum number of signatures). The petitions must contain valid signatures from at least 44 of Ohio's 88 counties, in an amount equal to at least five percent of the total votes cast in the last gubernatorial election in those 44 counties. Ohio Const. Art. II, § 1a; Ohio Rev. Code § 3519.14.

In addition, the "[t]he names of all signers to such petitions shall be written in ink" and the petition initiative must include a "statement of the circulator, as may be required by law, that he witnessed the affixing of every signature" Ohio Const. Art. II, § 1g; *see* Ohio Rev. Code § 3501.38(B). "No person shall write any name other than the person's own . . .  [and] no person may authorize another to sign for the petition," Ohio Rev. Code § 3501.38; Ohio Const. Art. II § 1g.

The proponents of the amendment must file their petitions with the Secretary of State no later than 125 days before the general election to qualify for the ballot. Ohio Const. Art. II, § 1a.

"This year, in order to qualify for the November general-election ballot, the petitioners must submit their petitions on or before July 1, 2020." *State ex rel. Ohioans for Secure & Fair Elections*, 2020-Ohio-1459, *P5 (Ohio 2020). The proponents must file the completed petitions and signatures in searchable electronic form with a summary of the number of part petitions per county and the number of signatures, along with an index of the electronic copy of the petition. Ohio Rev. Code § 3519.16(B). After a petition is filed with the Secretary of State, various deadlines are triggered for the Secretary of State to determine the sufficiency of the signatures, for supplemental signatures to be collected, and for challenges to petitions and signatures to be filed in the Ohio Supreme Court.

### 2. Initiative Procedure for Local Ordinances and Measures

Article II, §1f of the Ohio Constitution reserves the use of referendum and initiative powers to the citizens of a municipality for questions on which a municipality is "authorized by law to control by legislative action." Ohio Const., Art. II, § 1f.

Ohio Revised Code § 731.28 outlines generally the procedure by which municipal initiative petitions are to be submitted, verified, and certified to the board of elections for placement on the ballot. The statute states that, "[o]rdinances and other measures providing for the exercise of any powers of government granted by the constitution or delegated to any municipal corporation by the general assembly may be proposed by initiative petition." *Id*. Such petitions must contain the signatures of not less than ten per cent of the number of electors who voted for governor at the most recent general election for the office of governor in the municipal corporation." *Id*.

Ohio law requires the proponents of local initiative petitions to file "a certified copy of the proposed ordinance or measure with the city auditor or the village clerk" prior to its circulation. Ohio Rev. Code § 731.32. After the initial filing of the proposed ordinance with the city auditor

or village clerk, circulators of initiative petitions may begin to collect signatures by circulating ""a full and correct copy of the title and text of the proposed ordinance or other measure." Ohio Rev. Code § 731.31.

Ohio Revised Code § 731.31, which contains requirements for the presentation of municipal initiative and referendum petitions, provides that these petitions "shall be governed in all other respects by the rules set forth in section 3501.38 of the Revised Code." A signer "must be an elector of the municipal corporation in which the election, upon the ordinance or measure proposed by such initiative petition, or the ordinance or measure referred to by such referendum petition, is to be held." Ohio Rev. Code § 3501.38(B). Moreover, the signatures must be "affixed in ink" and accompanied by information that can be used to identify the signer. *Id.*

The circulator of an initiative petition must "sign a statement made under penalty of election falsification that the circulator witnessed the affixing of every signature, that all signers were to the best of the circulator's knowledge and belief qualified to sign, and that every signature is to the best of the circulator's knowledge and belief the signature of the person whose signature it purports to be or of an attorney in fact acting pursuant to section 3501.382 of the Revised Code." Ohio Rev. Code § 3501.38(E)(1).

Pursuant to Ohio Revised Code § 731.28, 10 days after a petition containing the required number of signatures is filed, the auditor or clerk transmits the petition and a certified copy of the proposed issues to the board of elections to determine the number of valid signatures. *Id*. The board of elections then certifies the number of signatures and returns the petition to the auditor or clerk within 10 days after receiving it. *Id*. The auditor or clerk "then certifies to the board the validity and sufficiency of the petition and the board submits the petition to the electors at the next election occurring 90 days after the auditor's certification." *Id*.

### B.     The Parties

Thompson Plaintiffs are proponents of initiative petitions that would enact local legislation. Plaintiffs-Intervenors are proponents of two separate constitutional amendments. Although they have achieved differing levels of progress in this regard, Plaintiffs all began their attempts to comply with Ohio's initiative procedures before the pandemic.

### 1.  Thompson Plaintiffs

Plaintiffs Chad Thompson, William Schmitt and Don Keeney are registered voters in the State of Ohio who regularly circulate initiative petitions they seek to be placed on local election ballots throughout Ohio. (Stip. Facts ¶ 1.) Thompson Plaintiffs routinely and regularly circulate in Ohio proposed initiatives in cities and villages that seek to amend local ordinances and laws that criminalize and/or penalize marijuana possession. For example, a local ballot initiative was filed in Windham, Ohio in August of 2018, that was put to that Villages voters on November 6, 2018, and passed.  (Stip. Facts ¶ 2.)

Plaintiffs' proposed marijuana initiatives they intend to be filed, but have not yet been, for inclusion on the November 3, 2020 general election ballot with the appropriate officials in McArthur, Ohio, Rutland, Ohio, Zanesville, Ohio, New Lexington, Ohio, Baltimore, Ohio, Syracuse, Ohio, Adena, Ohio, Cadiz, Ohio and Chagrin Falls, Ohio. (Stip. Facts ¶ 3.) On or before February 27, 2020, Plaintiffs filed proposed marijuana initiatives with local officials in Jacksonville, Ohio, Trimble, Ohio, Glouster, Ohio, Maumee, Ohio, and Akron, Ohio, in order to begin collecting the signatures needed to have those proposed measures placed on the November 3, 2020 general election ballot. (Stip. Facts ¶ 4, Exhs. 2-6.) Plaintiffs, in the present case, must gather signatures from a number of voters equal to percent of the total gubernatorial vote in the city or village where they seek to include an initiative and submit these signatures to the city

auditor or village clerk no later than approximately July 16, 2020 in order to have that initiative included on the cities' and villages' November 3, 2020 election ballots. (Stip. Facts ¶ 13.)

### 2. Ohioans for Safe and Secure Election Plaintiffs

Plaintiff-Intervenor Ohioans for Safe and Secure Elections ("OSFE") is a political action committee seeking through Ohio's initiative process to place a constitutional amendment on the November 3, 2020 ballot concerning the voting rights of Ohioans and Ohio election procedure. (*See* OFSE Compl., ¶¶ 1, 19, ECF No. 14.) Plaintiffs-Intervenors Darlene L. English, Laura A. Gold, Hasan Kwame Jeffries, Isabel C. Robertson, and Ebony-Speaks Hall are residents and electors of the State of Ohio and are members of the OFSE, and Plaintiffs-Intervenors Susan Zeigler, Scott Campbell, Paul Moke, and Andrew Washington seek to sign and/or circulate petitions to place OFSE's proposed amendment on the ballot. (Compl. at ¶¶ 9-13, ECF No. 14.) Beginning in January 2020, OFSE collected more than 2,000 signatures from eligible Ohio signers in support of its proposed amendment, which was certified by the Ohio Attorney General on February 20, 2020. (Compl. at ¶¶ 21-25, ECF No. 14.) On April 23, 2020, the Ohio Ballot Board certified the OSFE's proposed amendment. (*Id.* at ¶ 27.) OFSE has contracted with a petition circulation firm, Advanced Microtargeting ("AMT") to assist in circulating its proposed amendment and has spent over $500,000 on its campaign. (*Id.* at ¶¶ 19-20.)

### 3. Ohioans for Raising the Wage Plaintiffs

Likewise, Plaintiff-Intervenor Ohioans for Raising the Wage ("OFRW") is a ballot issue committee operating in the State of Ohio, and Plaintiffs-Intervenors Anthony A. Caldwell, James E. Hayes, David G. Latanick, and Pierrette M. Talley are the members of the committee. (Compl. at ¶¶ 6-7, ECF No. 17-1.) ORFW Intervenors seek to amend the Ohio constitution through the proposal of an initiative petition that would raise Ohio's minimum wage incrementally from its

current rate to $13.00 over the span of several years beginning on January 1, 2021 and ending on January 1, 2025. (Compl. at ¶ 12, ECF No. 17-1.) On October 12, 2019, OFRW Intervenors started circulating an initiative petition containing a summary and text of the proposed amendment. (*Id.* at ¶ 13.) OFRW filed the summary petition along with 1,898 signatures with the attorney general on January 17, 2020, and the attorney general certified that the summary of the proposed amendment was fair and truthful on January 27, 2020. (*Id.* at ¶ 15.) Thereafter, the Ohio Ballot Board certified the proposed amendment on February 5, 2020. (*Id.* at ¶ 16.) Two weeks later, on February 17, 2020, OFRW contracted with a petition circulation firm, FieldWorks, to acquire signatures in support of the amendment's placement on the November 3, 2020 election. (*Id.* at ¶ 17.) With the assistance of FieldWorks and volunteer supporters, OFRW began to circulate the final version of its amendment on February 28, 2020. (*Id.* at ¶ 18-20.)

### 4. Defendants

Defendants are Ohio Governor DeWine, Director of the Ohio Department of Health Dr. Acton and Ohio Secretary of State LaRose. (Stip. Facts ¶¶ 9-11.) Following the outbreak of COVID-19, Governor DeWine issued various orders directed towards protecting Ohio's citizens from its spread. (Stip. Facts ¶ 9.) Likewise, Ohio Department of Health Director Dr. Amy Acton issued various health orders to protect Ohio citizens from the COVID-19 pandemic. (Stip. Facts ¶ 10.) Ohio Secretary of State Frank LaRose is vested by Ohio law with the authority to enforce Ohio's election laws and to direct that local elections boards comply with Ohio law, the Constitution of the United States, and his own directives and advisories. (Stip. Facts ¶ 11.) At all relevant times Defendants in this action were and are engaged in state action and were and are acting under color of Ohio law. (Stip. Facts ¶ 12.)

### C.      COVID-19 and Ohio's Response

On January 30, 2020, the World Health Organization ("WHO") declared the outbreak of COVID-19 a public health emergency of international concern. (Stip. Facts ¶ 14.) On January 31, 2020, the President of the United States suspended entry into the United States of foreign nationals who had traveled to China. (Stip. Facts ¶ 15.).

On January 30, 2020, the Director of the National Center for Immunization and Respiratory Diseases at the Centers for Disease Control and Prevention ("CDC") announced that COVID-19 had spread to the United States. (Stip. Facts ¶ 16.) On March 3, 2020, Governor DeWine announced that the Arnold Sports Festival, a large gathering of athletes and spectators in downtown Columbus, Ohio, was closed to spectators. (Stip. Facts ¶ 17.)

On March 9, 2020, Governor DeWine declared a state of emergency in Ohio. (Stip. Facts ¶ 18.) On March 13, 2020, the Columbus Metropolitan Library closed its branches. (Stip. Facts ¶ 19.) Parades and events were canceled throughout Central Ohio at this same time, including the Columbus International Auto Show in Columbus, Ohio, and St. Patrick's Day parades in Columbus and Dublin. (Stip. Facts ¶ 20.)

On March 13, 2020, the President of the United States declared a national emergency retroactive to March 1, 2020. (Stip. Facts ¶ 21.) On March 9, 2020, the Ohio State University suspended classes. (Stip. Facts ¶ 22.)

On March 12, 2020, Governor DeWine and the Dr. Acton ordered mandatory emergency closings throughout Ohio. (Stip. Facts ¶ 23.)[1] On March 12, 2020, Governor DeWine ordered all

---

[1] Governor DeWine has issued several executive orders in response to the outbreak of COVID-19. The orders focus mainly on granting Ohio's various government agencies the ability to adopt emergency rules and amendments to Ohio's administrative code. Yet, others such as Executive Order 2020-01D (Mar. 9, 2020) require the Ohio Department of Health to formulate general treatment guidelines to curtail the spread of COVID-19.

private and public schools, grades K through 12, closed beginning at the conclusion of the school day on Monday, March 16, 2020. (Stip. Facts ¶ 24.)

On March 12, 2020, the Ohio Department of Health issued "Director's Order: In re: Order to Limit and/or Prohibit Mass Gatherings in Ohio." (Stip. Facts ¶ 25.) On March 17, 2020, the Ohio Department of Health issued "Director's Order: In re: Amended Order to Limit and/or Prohibit Mass Gatherings and the Closure of Venues in the State of Ohio." (Stip. Facts ¶ 26.)

On March 15, 2020, the Ohio Department of Health issued "Director's Order: In re: Order Limiting the Sale of Food and Beverages, Liquor, Beer and Wine, to Carry-out and Delivery Only." (Stip. Facts ¶ 27.) On March 16, 2020, the Ohio Department of Health issued "Director's Order: In re: Closure of Polling Locations in the State of Ohio on Tuesday, March 17, 2020." (Stip. Facts ¶ 28.)

On March 19, 2020, the Ohio Department of Health issued "Director's Order to Cease Business Operations at Hair Salons, Day Spas, Nail Salons, Barber Shops, Tattoo Parlors, Body Piercing Locations, Tanning Facilities and Massage Therapy Locations." (Stip. Facts ¶ 29.)

On March 22, 2020, the Ohio Department of Health issued "Director's Order that All Persons Stay at Home Unless Engaged in Essential Work or Activity." (Stip. Facts ¶ 30.). And on April 30, 2020, Defendant Governor DeWine announced a plan to begin to re-open Ohio, and the Ohio Department of Health issued the "Director's Stay Safe Ohio Order." (Stip. Facts ¶ 31.)

**D.    Plaintiffs' Claims**

Plaintiffs contend that prior to the onset of the COVID-19 pandemic, they were working diligently to place their proposed issues on the November 3, 2020 general election ballot, but that the pandemic and Ohio's responding Ohio's Stay-at-Home orders have made it impossible to circulate petitions and obtain the signatures required by Ohio law to qualify their issues for the

11

November general election. Several of the Plaintiffs wrote to Defendant LaRose in March, asking him to modify or decline to enforce Ohio's signature requirements "in order to make it possible, in light of the current pandemic" for their proposed amendments to be placed on the ballot this fall." (Correspondence between Secretary of State's office and OSFE Campaign Director, Mar. 26, 2020, ECF No. 15-1.) Defendant LaRose responded that he "is not free to modify or to refuse to enforce the explicit constitutional and statutory requirements of initiative petition gathering, even in the current crisis." (*Id.*) OFSE and ORFW Plaintiffs sought a state court order enjoining the signature gathering requirements in the Ohio Constitution and Revised Code in light of the pandemic. *Ohioans for Raising the Wage v. LaRose*, No. 20-CV-2381, at 7 (Ohio Com. Pl., Apr. 28, 2020). The Franklin County Common Pleas denied the Plaintiffs' request for a preliminary injunction, finding Ohio's "constitutional language does not include an exception for extraordinary circumstances or public health emergencies" and that the court "does not have the power to order an exception or remedy that was not contemplated or intended by the plain language of the Ohio Constitution." *Id.* at 8.

In this action, Plaintiffs seek declarations that in the extraordinary circumstances presented by the COVID-19 pandemic, Ohio's signature requirements violate Plaintiffs' First and Fourteenth Amendment rights as applied for the November 3, 2020 election.

Plaintiffs originally requested emergency injunctive relief enjoining enforcement of Ohio's signature requirements and placing their initiatives on the ballot, or in the alternative, modifying those requirements by permitting electronic signatures, reducing the numerical signature requirement, and extending the submission deadline. In light of the Sixth Circuit's recent decision in *Esshaki v. Whitmer*, No. 20-1336, 2020 WL 2185553 (6th Cir. May 5, 2020) to be discussed more fully below, however, Plaintiffs now request that the parties be ordered to confer to develop,

with assistance from the Court, adjustments to the signature requirements as applied to Plaintiffs for the November 2020 general election.

## III.

Rule 65 of the Federal Rules of Civil Procedure provides for injunctive relief when a party believes it will suffer immediate and irreparable injury, loss, or damage. Still, an "injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). While Plaintiffs requested either temporary restraining orders or preliminary injunctions, the Court finds it appropriate to address only the requests for preliminary injunctions.

In determining whether to issue a preliminary injunction, the Court must examine four factors: (1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction. *Id.* (citing *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000); *McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir.1997) (*en banc*). These considerations are factors a court must balance, not prerequisites that must be met. *Id.* (citing *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 347 (6th Cir. 1998). "'When a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor.'" *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 412 (6th Cir. 2014) (quoting *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)).

**IV.**

This case reflects the tension between the state's interest in protecting the integrity and reliability of its constitutional amendment and local initiative process, and the Plaintiffs' First Amendment rights during a global pandemic that has disrupted the lives and livelihoods of millions of Ohioans. Plaintiffs contend that they are substantially likely to succeed on their claims that Ohio's enforcement of the signature requirements for placing local initiatives and constitutional amendments on the ballot, combined with the COVID-19 pandemic and Ohio's Stay-at-Home Orders, violates the First Amendment as applied to them.

**A.     Likelihood of Success**

The First Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." U.S. Const. amend. I.  The First Amendment, however, does not provide a right to place initiatives or referendum on the ballot. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 212 (2010) (Sotomayor, J., concurring) ("[W]e must be mindful of the character of initiatives and referenda. These mechanisms of direct democracy are not compelled by the Federal Constitution."); *see also Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 295 (6th Cir. 1993) ("[T]he right to an initiative is not guaranteed by the federal Constitution"). "It is instead up to the people of each State, acting in their sovereign capacity to decide whether and how to permit legislation by popular action." *Reed*, 561 U.S. at 212 (Sotomayor, J., concurring). "States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally." *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 191 (1999).

14

However, "a state that adopts an initiative procedure violates the federal Constitution if it unduly restricts the First Amendment rights of its citizens who support the initiative." *Taxpayers United*, 994 F.2d 291, 295 (6th Cir. 1993) (citing *Meyer v. Grant*, 486 U.S. 414 (1988)). Accordingly, "although the Constitution does not require a state to create an initiative procedure, if it creates such a procedure, the state cannot place restrictions on its use that violate the federal Constitution." *Id.*

The Ohio Constitution and statutes at issue in the instant action set forth several formal requirements for petition signature gathering for local initiatives and constitutional amendments that are challenged here, including: the total number of signatures required, the geographic distribution of signers, requirements that signatures be made in ink, not be made by proxy, and must be personally witnessed by the petition circulators, and deadlines for submission of petitions to the Ohio Secretary of State and local authorities.

Plaintiffs claim that enforcement of these requirements "severely burden" their First Amendment ballot access and freedom of association rights and cannot survive strict scrutiny under *Anderson v. Celebrezze*, 460 U.S. 780 (1983), as later refined in *Burdick v. Takushi*, 504 U.S. 428 (1992) ("*Anderson-Burdick*"), which they contend governs this analysis. OFSE Plaintiffs have also argued that certain requirements that are premised on gathering signatures in person, namely, the requirements that petitions be signed in ink and witnessed by the circulator, severely burden their core political speech, and cannot survive the exacting scrutiny inquiry under *Meyer v. Grant*, 486 U.S. 414 (1988).

Defendants contend, however, that the First Amendment is not even implicated here because Ohio's petition restrictions regulate the mechanics of the initiative process, and do not regulate political speech or expressive conduct or a candidate's right to access the ballot. (Opp. at

15

9, 14, ECF No. 40.) Defendants further argues if the federal constitution is implicated, "no state actor has infringed on Plaintiffs' First Amendment rights" and, the provisions at issue survive the applicable review, which they maintain is closer to rational basis. Under that analysis, any burden on Plaintiffs' First Amendment rights is slight and outweighed by the Defendants' substantial regulatory interests. (*Id*. at 9, 17.)

The Court will address all of these arguments made by the parties, starting with determining the appropriate framework to utilize when reviewing the constitutional and statutory provisions at issue here.

### 1. Framework

Plaintiffs urge this Court to adopt the reasoning of the Sixth Circuit's recent opinion in *Esshaki v. Whitmer*, 2020 WL 2185553 (6th Cir. May 5, 2020), where the court upheld the core of the district court's preliminary injunction enjoining Michigan from enforcing the statutory ballot-access provisions for political candidates in advance of Michigan's upcoming primary election under the framework established in *Anderson-Burdick*.

In *Esshaki*, the plaintiffs asserted that Michigan's March 23, 2020 Stay-At Home Orders issued in response to the COVID-19 pandemic prevented them collecting the required signatures by the April 21, 2020 deadline, and that Michigan's enforcement of the statutory requirements "under the present circumstances, is an unconstitutional infringement on their (and voters') rights to association and political expression." *Id*. at 1. Michigan, like Ohio, "insist[ed] on enforcing the signature-gathering requirements as if its Stay-at-Home Order . . . had no impact on the rights of candidates and the people who may wish to vote for them." 2020 WL 1910154 at *1 (E.D. Mich. Apr. 20, 2020). *Id*. Michigan also argued that circulators should have braved the crisis and gathered signatures. The district court rejected the state's argument as "both def[ying] good sense

and fl[ying] in the face of all other guidance that the State was offering to citizens at the time." *Id*. at *5. "[P]rudence at that time counseled in favor of doing just the opposite." *Id*.

Applying *Anderson-Burdick*, the district court found a severe burden on the Plaintiffs' First Amendment rights and applied strict scrutiny to invalidate the combined effects of the emergency orders, Michigan's in-person signature collection requirements, and the pandemic. The district court concluded that "[u]nder these unique historical circumstances," the state's enforcement of its Stay-at-Home Order and the statutory ballot-access requirements operated "in tandem to impose a severe burden on Plaintiff's ability to seek elected office, in violation of his First and Fourteenth Amendment rights to freedom of speech, freedom of association, equal protection, and due process of the law." 2020 WL 1910154 at *1 (E.D. Mich. Apr. 20, 2020). The court noted that the plaintiff "was "challenging neither the constitutionality of the State's ballot access laws nor the Governor's Stay-at-Home Order in isolation. Rather, Plaintiff seeks relief because the two regulations, taken together, have prevented him from collecting enough signatures before the deadline." *Id*. at *4.

The Sixth Circuit, whose decisions bind this Court, agreed with the district court that under *Anderson-Burdick*, "the combination of the State's strict enforcement of the ballot-access provisions and the Stay-at-Home Orders imposed a severe burden on the plaintiffs' ballot access, so strict scrutiny applied, and even assuming that the State's interest (*i.e*., ensuring each candidate has a reasonable amount of support) is compelling, the provisions are not narrowly tailored *to the present circumstances*." *Id*. (emphasis in original). The court concluded that Michigan's strict application of its ballot-access provisions was thus unconstitutional as applied to the plaintiffs. *Id*.

Defendants contend *Esshaki* does not apply here for two reasons: 1) Michigan's Stay-at-Home Order did not contain an exemption for First Amendment activity; and 2) *Esshaki* involved a candidate seeking access to the ballot, not an initiative.

17

First, in concluding that the plaintiffs' First Amendment rights were severely burdened, the district court found that Michigan's Stay-at-Home Order did not contain "any exception for campaign workers." 2020 WL 1910154 at *2. Here, the Defendants argue that no state action has infringed on the Plaintiffs' rights because Ohio's Stay-at-Home Orders "have always specifically exempted First Amendment Protected Speech" and the April 30, 2020 Stay Safe Ohio Order specifically exempts "petition or referendum circulators." (Opp. at 6, 19, ECF No. 40.) Plaintiffs vigorously dispute whether this language actually exempted their signature collection efforts from Ohio's Stay-at-Home Orders. (*See e.g.,* Reply at 6–11, ECF No. 41.)

But this Court need not determine whether Ohio's Stay-at-Home Orders exempt petition circulation because, as Plaintiffs clarify, the state action challenged here is "Ohio's strict enforcement of its ballot access provisions – in the face of this pandemic" and not the State's Orders. (*See* OFSE Reply at 2, ECF No. 43.) Therefore, it is irrelevant to this Court's analysis whether there is or was an exemption in Ohio's Stay-at-Home Orders. This conclusion is consistent with the holding in *Esshaki*, where the Sixth Circuit held that Michigan's "strict application of the ballot-access provisions is unconstitutional as applied here" due to the "combination of the State's strict enforcement of the ballot-access provisions and the Stay-at-Home Orders[.]" 2020 WL 2185553 at *1 (6th Cir. May 5, 2020). It is not uncommon for courts to grant relief in the aftermath of natural disasters based on states' continued enforcement of election regulations. *See e.g., Florida Democratic Party v. Scott*, 215 F.Supp.3d 1250 (N.D. Fla. 2016) (requiring state to extend voter registration deadline in the face of Hurricane Matthew); *Georgia Coalition for the Peoples' Agenda, Inc. v. Deal*, 214 F.Supp.3d 1344 (S.D. Ga. 2016) (same).

The issue before this Court is thus similar to the issue in *Esshaki*—whether strict enforcement of Ohio's signature requirements, combined with the COVID-19 pandemic and effect

18

of the Stay-at-Home Orders, unconstitutionally burden Plaintiffs' First Amendment rights *as applied here*.

Second, Defendants argue *Esshaki* is inapplicable because that case involved a candidate seeking access to the ballot, not an initiative. Defendants further argue that *Anderson-Burdick* does not apply here because Ohio's signature requirements "regulate the mechanics of the initiative process, not protected speech or a candidate's access to the ballot, and as a result, the First Amendment does not apply." (Opp. at 14, ECF No. 40). "In short," Defendants contend, "Plaintiffs have no First Amendment right to speak or associate by placing initiatives on the State's or a county's ballot." (*Id.* at 17.)

This Court agrees that the right to an initiative is not guaranteed by the First Amendment, but that does not mean that initiatives are without First Amendment protection. Like initiatives, there is "no fundamental right to run for elective office," and yet the Supreme Court has recognized laws restricting candidates' access to the ballot implicate the First Amendment because they "'place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.'" *Esshaki*, 2020 WL 1910154, at *4 (E.D. Mich. Apr. 20, 2020) (quoting *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968)). Similarly, "[a] state that adopts an initiative procedure violates the federal Constitution if it unduly restricts the First Amendment rights of its citizens who support the initiative." *Taxpayers United*, 994 F.3d at 295; *see also Buckley*, 525 U.S. at 190-91 ("Initiative petition circulators also resemble candidate-petition signature gathers, however, for both seek ballot access.") (citing *Timmons v. Twin Cities Area New Party*, 520 U.S. 351(1997)).

Importantly, this Court is bound by the Sixth Circuit, which has twice in the last two years applied the *Anderson-Burdick* framework to First Amendment challenges to Ohio's statutory requirements for initiative petitions. *See Schmitt v. LaRose*, 933 F.3d 628 (6th Cir. 2019), *reh'g en banc denied* (6th Cir. Sept. 4, 2019), *cert. pending*, No. 19-974 (filed Feb. 3, 2020); *see also Committee to Impose Term Limits v. Ohio Ballot Board*, 885 F.3d 443 (6th Cir. 2018). This Court, and the Sixth Circuit, therefore disagree with Defendants that the First Amendment does not apply because Ohio's signature requirements "regulate the mechanics of the initiative process[.]" *See Daunt v. Benson*, 956 F.3d 396, 422(6th Cir. Apr. 15, 2020) (Readler, J., concurring) ("*Anderson-Burdick* is tailored to the regulation of election mechanics."); *see also Schmitt*, 933 F. 3d at 639 ("Instead, we generally evaluate First Amendment challenge to state election regulations under the three-step *Anderson-Burdick framework*"); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995) (explaining *Anderson's* "ordinary litigation" test did not apply because unlike the statutory provisions in *Anderson*, the challenged statute did not control the mechanics of the electoral process. It is a pure regulation of speech."). Accordingly, this Court too will apply *Anderson-Burdick* to Plaintiffs' challenges here.

a. ***Anderson-Burdick***

*Anderson-Burdick* provides a 'flexible standard'" to evaluate "'[c]onstitutional challenges to specific provisions of a State's election laws'" under the First Amendment. *See Daunt v. Benson*, 956 F.3d at 406(citing *Anderson*, 460 U.S. 780 and *Burdick*, 504 U.S. 428 (1992)). Under *Anderson-Burdick*, "[a] court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to

which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). The severity of the burden on those rights determines the level of scrutiny to be applied. *See Daunt*, 956 F.3d at 407 (citing *Burdick*, 504 U.S. at 434).

"When a state promulgates a regulation which imposes a 'severe' burden on individuals' rights, that regulation will only be upheld if it is 'narrowly drawn to advance a state interest of compelling importance.'" *Lawrence v. Blackwell*, 430 F.3d 368, 373 (6th Cir. 2005) (quoting *Burdick*, 504 U.S. at 434). "The analysis requiring that a state law be narrowly tailored to accomplish a compelling state interest is known as the 'strict scrutiny' test." *Esshaki*, 2020 WL 1910154, at *4 (E.D. Mich. Apr. 20, 2020).

But "minimally burdensome" regulations are subject to "a less-searching examination closer to rational basis," *Committee To Impose Term Limits*, 885 F.3d at 448, and "a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Schmitt*, 933 F.3d at 639 (citing *Timmons*, 520 U.S. at 358). "Regulations falling somewhere in between—*i.e.*, regulations that impose a more-than-minimal but less-than-severe burden—require a 'flexible' analysis, 'weighing the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it.'" *Daunt*, 956 F.3d at 408(quoting *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016)). "This level of review is called 'intermediate scrutiny.[2]'" *Esshaki*, 2020 WL 1910154, at *4 (E.D. Mich. Apr. 20, 2020).

The Court will first consider the "character and magnitude" of the burden on Plaintiffs' First Amendment rights under *Anderson-Burdick*. Plaintiffs contend that this burden is "severe."

---

[2] The Court notes that based on its analysis herein of the severity of the burden and the tailoring of the application of the laws applicable here during this pandemic, the provisions at issue would not survive this intermediate level of scrutiny.

According to Plaintiffs, their ballot access, freedom of speech, and freedom of association rights are severely burdened because Defendants' strict enforcement of the signature requirements in light of the ongoing COVID-19 pandemic and Stay-at-Home Orders has made it impossible to qualify their measures for the ballot. "'The hallmark of a severe burden is exclusion or virtual exclusion from the ballot.'" *Schmitt*, 933 F.3d at 639 (quoting *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 574 (6th Cir. 2016). "In some circumstances, the 'combined effect' of ballot-access restrictions can pose a severe burden." *Grimes*, 835 F.3d at 575. "A very early filing deadline, for example, combined with an otherwise reasonable petitioning requirement, can impose a severe burden, especially on independent candidates or minority parties that must gather signatures well before the dominant political parties have declared their nominees." *Id*. at 575. In contrast, "[a] burden is minimal when it 'in no way limit[s] a political party's access to the ballot.'" *Id.* at 577 (quoting *Libertarian Party of Ohio v. Blackwell*, 462 F.3d at 537).

In *Schmitt*, the Sixth Circuit assessed the plaintiffs' claims that "the Ohio ballot-initiative process unduly hampers their right to political expression." *See* 933 F.3d at 639 ("We first examine whether the burden imposed by the Ohio ballot-initiative statutes is "severe." *Timmons*, 520 U.S. at 358."). The Sixth Circuit analyzed the burden on Plaintiffs' access to the ballot imposed by the statutes regulating the ballot-initiative process, finding that the cost of seeking mandamus relief to challenge a board of election's certification decision "disincentivizes some ballot proponents from seeking to overturn the board's decision, thereby limiting ballot access." *Id*. at 641 (citing *Grimes*, 835 F.3d at 577).

Similarly, in *Esshaki*, the Sixth Circuit agreed with the district court that "the combination of the State's strict enforcement of the ballot-access provisions and the Stay-at-Home Orders

imposed a severe burden on the plaintiffs' ballot access[.]" 2020 WL 2185553 at *1 (6th Cir. May 5, 2020). In concluding the burden was severe, the court held:

> The reality on the ground for Plaintiff and other candidates is that state action has pulled the rug out from under their ability to collect signatures. Since March 23, 2020, traditional door-to-door signature collecting has become a misdemeanor offense; malls, churches and schools and other public venues where signatures might be gathered have been shuttered, and even the ability to rely on the mail to gather signatures is uncertain—if not prohibitively expensive. Absent relief, Plaintiff's lack of a viable, alternative means to procure the signatures he needs means that he faces virtual exclusion from the ballot.

> After considering Defendants' arguments, this Court has little trouble concluding that the unprecedented—though understandably necessary—restrictions imposed on daily life by the Stay-at-Home Order, when combined with the ballot access requirements of Sections 168.133 and 168.544f, have created a severe burden on Plaintiff's exercise of his free speech and free association rights under the First Amendment . . .—as expressed in his effort to place his name on the ballot for elective office. *See Libertarian Party of Ky*., 835 F.3d at 574 ("The hallmark of a severe burden is exclusion or virtual exclusion from the ballot.").

2020 WL 1910154, at *6 (E.D. Mich. Apr. 20, 2020).

Contrarily, Defendants contend that any burden on Plaintiffs' First Amendment rights is "slight" (*See* Opp. at 18, ECF No. 40.) Defendants further contend that Plaintiffs have offered no reason why their issues must be placed on the November 2020 ballot and failed to show that they have attempted to obtain signatures through an alternative process, such as by mail or by phone. (*Id*. at 18-20.) Additionally, Defendants argue that "Ohio is in the process of reopening its doors" and the Plaintiffs' "ability to obtain signatures is improving daily." (*Id*. at 20-21.)

According to Defendants, "both the constitutional framework for proposed constitutional amendments and the statutory framework for proposing local ordinances are content-neutral and nondiscriminatory regulations." (*Id*. at 18. (citing *Taxpayers United*, 994 F.2d at 297).) In *Taxpayers United*, the Sixth Circuit held that Michigan's statute procedure for validating initiative petition signatures, by performing "technical checks" for compliance with certain statutory

requirements, did not violate the plaintiffs' rights to free speech and political association of the plaintiffs. The court explained that its result may have been different if "the plaintiffs were challenging a restriction on their ability to communicate with other voters about proposed legislation, or if they alleged they were being treated differently than other groups seeking to initiate legislation." 994 F.3d at 297. But "because the right to initiate legislation is a wholly state-created right," the Sixth Circuit held it was "constitutionally permissible for Michigan to condition the use of its initiative procedure on compliance with content-neutral, nondiscriminatory regulations that are, as here, reasonably related to the purpose of administering an honest and fair initiative procedure." *Id*.

In ordinary times, the Court may agree with Defendants that Ohio's signature requirements would likely be considered "reasonable, nondiscriminatory restrictions" that could be justified by the "State's important regulatory interests." *See Anderson v. Celebrezze,* 460 U.S. 780, 788 (1983); *see also Committee to Impose Term Limits*, 885 F.3d at 448 ("Ohio's single-subject rule is such a minimally burdensome and nondiscriminatory regulation because it requires only that Plaintiffs submit their two proposed constitutional amendments in separate initiative petitions."). "States enjoy 'considerable leeway' to choose the subjects that are eligible for placement on the ballot and to specify the requirements for obtaining ballot access (*e.g.*, the number of signatures required, the time for submission, and the method of verification)." *See John Doe No. 1 v. Reed*, 561 U.S. 186, 212, (2010) (Sotomayor, J., concurring) (citing *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 191 (1999)).

These times, however, are not ordinary. Plaintiffs do not argue that Ohio's signature requirements are facially unconstitutional. Plaintiffs instead contend that they are unconstitutional as applied to them during this extraordinary time. That is, the COVID-19 pandemic has made it

24

impossible to circulate petitions in person, the only method permitted under Ohio law because of the ink signature and witness requirements. Plaintiffs maintain that because they are unable to circulate in person, and they have no other means of collecting signatures, they are unable to meet the other numerical and geographical requirements by the deadline. Specifically, they state:

> It is axiomatic that face-to-face encounters between people are essential for any physical in "ink" signature-gathering. Given the temporary changes in our society—specifically the severe reduction of the ability to physically encounter other people—there is no means of complying with Ohio's formal signature requirements. In the throes of today's extraordinary circumstances, Ohio's requirements operate to completely eradicate Intervenors' indelible First Amendment, Fourteenth Amendment and Ohio constitutional rights to ballot access, freedom of speech, and freedom of association.

(OFSE Compl., ¶ 5; *see also* OFRW Compl. ¶ 4.)

> Here, OFRW Intervenors are faced not with a mere regulation of how they may access the ballot, but what amounts to a ban on ballot access, and on their related speech and association rights. Petition circulators cannot obtain in-person, pen-to-paper signatures outside of their immediate households, and signers cannot sign petitions outside of their immediate households. Nor can supporters mobilize like-minded people to do these things. Public gatherings and in-person contact are suspended. OFRW has no hope of meeting Ohio's requirements.

(OFRW Mot. at 10; see also OFSE Mot. at 10; *see also* Thompson Mot. at 12-13 ("Under Ohio law as it now exists, Plaintiffs have no lawful procedure by which they may qualify their initiatives for Ohio's November 3, 2020 general . . . Ohio's signature collection requirement under current circumstances makes it impossible to qualify initiatives for the ballot.").)

As did the *Esshaki* court, this Court finds that in these unique historical circumstances of a global pandemic and the impact of Ohio's Stay-at-Home Orders, the State's strict enforcement of the signature requirements for local initiatives and constitutional amendments severely burden Plaintiffs' First Amendment rights *as applied here*. *See* 2020 WL 2185553, at (1 (6th Cir. May 5, 2020).

25

Life as Ohioans knew it has drastically changed. Since March 22, 2020, all residents of Ohio have been mandated to stay home, with some limited exceptions that are all but clear. All non-essential business operations were ordered to cease activities. Sporting events and concerts have been cancelled. All polling locations were closed for the March 17, 2020 primary election. Public and private schools and universities moved to online learning and shut down campuses. Until very recently restaurants, bars, salons, and malls were closed to the public. Gatherings of 10 or more people have been prohibited. While some businesses are now re-opened, Ohioans have been directed to maintain social distancing, staying at least six feet apart from each other, and to wear masks or facial coverings.

The wet signature and witness requirements require circulators to go into the public and collect signatures in person. But the close, person-to-person contacts required for in person signature gathering have been strongly discouraged—if not prohibited—for several months because of the ongoing public health crisis, and likely pose a danger to the health of the circulators and the signers. Moreover, the public places where Plaintiffs may have solicited these signatures have been closed, and the public events drawing large crowds for Plaintiffs to share their message have cancelled and mass gatherings cancelled. And even if Plaintiffs had attempted to garner support for their measures by phone or mail, such efforts do not obviate the ink signature and witness requirements.

Plaintiffs cannot safely and effectively circulate their petitions in person. Ohio does not permit any other forms of signature gathering, including electronic signing. And because Plaintiffs cannot collect signatures in person or electronically, they have no hope of collecting the required number of signatures from the required geographic distribution by the July deadlines. As the district court in *Esshaki* concluded, without relief here, Plaintiffs "lack of a viable, alternative

means to procure the signatures" they need means that they face "virtual exclusion from the ballot." 2020 WL 1910154, at *3 (E.D. Mich. Apr. 20, 2020).

To be clear, this Court's decision is not a criticism of the Stay-at-Home Orders or Ohio's response to the COVID-19 crisis. Defendants Governor DeWine and Dr. Acton were some of the first in the nation to issue such orders to slow the spread of the coronavirus and are well-deserving of the national—and even global—praise they have received for their responses. See *The Leader We Wish We All Had*, N.Y. Times (May 5, 2020), https://www.nytimes.com/2020/05/05/opinion/coronavirus-ohio-amy-acton.html; *Coronaviru*s: *The US governor who saw it coming early*, BBC (Apr. 1, 2020), https://www.bbc.com/news/world-us-canada-52113186. Undoubtedly their actions have flattened the curve and saved the lives of countless Ohioans.

Yet the impact of the Stay-at-Home Orders on Ohioans and the continued risk of close interactions cannot be ignored. The reality is that the Orders and the COVID-19 pandemic have made it impossible for Plaintiffs to satisfy Ohio's signature requirements. Because the burden imposed by the enforcement of the requirements in these circumstances is severe, strict scrutiny is warranted.

### b. *Meyer v. Grant*

As explained in detail *supra*, this Court concludes that Sixth Circuit precedent requires application of the *Anderson-Burdick* framework to the issues presented in this action. The Court here, however, briefly addresses the OFSE Plaintiffs arguments that the more appropriate framework is that established under *Meyer v. Grant*, 486 U.S. 414, (1988); *see also Morgan v. White*, Case No. 20-C-2189, slip op. (N.D. Ill. May 18, 220) (Pallmeyer, C.J.) (applying *Meyer* in considering similar signature requirement and finding no severe burden there because, unlike the instant action, the plaintiffs' had slept on their rights to circulate petitions waiting until after the

pandemic hit to attempt to circulate petitions). Under *Meyer*, courts "apply 'exacting scrutiny,' and uphold the restriction only if it is narrowly tailored to serve an overriding state interest." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) (striking down Ohio statute prohibiting distribution of anonymous campaign literature).

On their face, the witness and ink signature requirements do not "regulate pure speech." *See McIntyre*, 514 U.S. at 357. OFSE argues that Ohio's ink signature and witness requirements that require all circulation to be done in person, during the extraordinary circumstances of this moment, have effectively banned circulation because "[c]irculators cannot safely gather signatures in person in the midst of a pandemic without endangering their own and others' health." (OFSE Mot. at 8, ECF No. 15.) Because Ohio law does not provide for other forms of signature collection, such as electronic signatures, their "core political speech" through circulating "is altogether suppressed." (*Id*.)

Even so, whether this Court were to apply *Meyer's* exacting scrutiny or *Anderson-Burdick's* strict scrutiny, the result is the same—these two provisions cannot withstand constitutional scrutiny.

### c.  Strict Scrutiny under *Anderson-Burdick*

In order to survive the strict scrutiny analysis, Defendants must show these requirements are "narrowly drawn to advance a state interest of compelling importance." *See Burdick*, 504 U.S. at 434. The Court considers Plaintiffs' challenges to: 1) ink signature requirements set forth in Article II § 1g and Ohio Revised Code § 3501.38(B), and the witness requirements in Article II § 1g and Ohio Revised Code § 3501.38(E); and 2) the numerical and geographical requirements in Article II § 1a, Article II § 1g, and Ohio Revised Code § 731.28, and the deadlines for submission of signatures in Article II § 1a and Ohio Revised Code § 731.28.

### i.      Ink Signature and Witness Requirements

The Court first addresses the ink signature and witness requirements and concludes Defendants have not established they are "narrowly tailored *to the present circumstances*." *Esshaki*, 2020 WL 2185553, at *1 (6th Cir. May 5, 2020).

In defense of the ink signature and witness requirements, Defendants contend that "states have a substantial interest in ensuring that submitted signatures are authentic," (*Id*. at 22 (citing *Buckley*, 525 U.S. at 205)), and that the Ohio Constitution confirms that "ensuring the validity of the signatures on petitions is an interest of the highest order of both the State and its people." (*Id*. at 23.) Defendants also assert that these requirements combat petition fraud by ensuring each elector signs for themselves and protecting against signatures being added later. (*Id*. at 23-24; *see also id*. at 30 ("un-witnessed, anonymous signature gathering invites fraud.").)

Defendants do not argue that these interests are "compelling" as required under strict scrutiny, because they contend that such an analysis is not warranted. But even assuming that ensuring they are compelling interests, the ink signature and witness requirements are narrowly tailored to achieve that interest in these particular circumstances. *See Citizens for Tax Reform v. Deters*, 518 F.3d 375, 387 (6th Cir. 2008) ("While eliminating election fraud is certainly a compelling state interest, [the statute] is not narrowly drawn.").

First, Defendants provide examples of how other signature requirements not challenged here (such as the requirement that every signer "be an elector of the state" and include "after his name the date of signing and his place of residence") achieve their interests, and that ink signatures are because "'boards of elections are required to compare petition signatures with voter registration cards to determine if the signatures are genuine[.]'" (Opp. at 23, ECF No. 40 (citing *State ex rel. Yiamouyiannis v. Taft*, 65 Ohio St.3d 205, 209, 602 N.E.2d 644 (1992)). But that requirement is

by directive of the Secretary of State, no by the Ohio Constitution or Revised Code. *See* Secretary of State Directive 2019-17.

Furthermore, there is no evidence that certain personally identifiable information, such as the last four digits of a signer's social security number as used for electronic voter registration and as proposed by Plaintiffs as methods to verify signatures, are any less reliable than boards of election employees comparing handwritten signatures, who likely have no training or expertise in handwriting analysis. Likewise, there is no evidence to support, nor reason to believe that enjoining enforcement of the ink signature and witness requirements and allowing electronic signatures would "likely inject fraud into Ohio's petition process." (Opp. at 2, ECF No. 40.); *see also See Citizens for Tax Reform,* 518 F.3d at 387 (finding statute was not narrowly tailored to eliminate election fraud because "there is no evidence in the record that most, many, or even more than a *de minimis* number of circulators who were paid by signature engaged in fraud in the past.").

Moreover, there are other provisions of Ohio law that "expressly deal with the potential danger that circulators might be tempted to pad their petitions with false signatures." *See Meyer*, 486 U.S. at 426-27. For example*, false signatures are a fifth-degree felony under Ohio Revised Code § 3599.28. It is also a crime for a signer to sign a petition more than once, to sign someone else's name, sign if they know they are not a qualified voter, accept anything of value for signing a petition, or make a false affidavit or statement concerning signatures on a petition. *See* Ohio Rev. § 3599.13. Violation of those provisions results in up to a $500 fine or up to six months imprisonment. *Id*. "These provisions seem adequate to the task of minimizing the risk of improper conduct in the circulation of a petition, especially since the risk of fraud or corruption, or the appearance thereof, is more remote at the petition stage of an initiative than at the time of balloting." *Meyer*, 486 U.S. at 427-28; cf. *First National Bank of Boston v. Bellotti*, 435 U.S. 765,

790 (1978) ("The risk of corruption perceived in cases involving candidate elections . . . simply is not present in a popular vote on a public issue").

OFSE and OFRW Plaintiffs have proposed a detailed system for collecting and submitting electronic signatures that contains many of the same safeguards as paper petitions in order to ensure signatures are authentic and prevent petition fraud, including the last four numbers of the signer's social security number to confirm identity, a method for circulators to monitor the online petitions, and various warnings about the criminal consequences of forging signatures and for election falsification. (*See* Leonard Decl., ECF No. 30-1; *see also* OFSE Reply at 18.) The interests in enforcing the ink signature and witness requirements—ensuring authenticity and combating fraud—can be achieved by the electronic system proposed by Intervenor Plaintiffs in conjunction with the other provisions in Ohio law not challenged here when considering the public health risks accompanying the close, person-to-person contact required to satisfy those requirements. Finally, the Court notes that large parts of the economy are conducted via electronic signatures, which can be linked to personal, secure identifiers and re-checked for errors or fraud.

In the context of the pandemic and the impact of the Stay-at-Home Orders on Plaintiffs' ability to safely come into close contact with potential signers, the enforcement of the ink signature and witness requirements is not narrowly tailored to a compelling state interest as applied to Plaintiffs *in these particular circumstances*. Accordingly, the Court finds that Plaintiffs have established they are likely to succeed on the merits of their challenges to the ink signature requirements set forth in Article II § 1g and Ohio Revised Code § 3501.38(B) for constitutional amendments and Ohio Revised Code § 3501.38(B) for local initiatives, as well as the witness requirements in Article II § 1g for constitutional amendments and Ohio Revised Code § 3501.38(E) for local initiatives.

### ii.      Numerical and Geographical Requirements and Deadlines

The Court next turns to the numerical and geographical requirements in Article II § 1a and II § 1g and Ohio Revised Code § 731.28, and the deadlines for submission of signatures in Article II § 1a and Ohio Revised Code § 731.28. For the following reasons, the Court finds the numerical and geographical requirements survive strict scrutiny, but the deadlines cannot.

Petitions for proposed local initiatives "must contain the signatures of not less than ten per cent of the number of electors who voted for governor at the most recent general election of the office of governor in the municipal corporation." Ohio Rev. Code § 731.28. In order to qualify local initiatives for the November 3, 2020 election, petitions must be filed with the city auditor or village clerk no later than approximately July 16, 2020. (Stip. Facts ¶ 13.)

Defendants argue "Ohio and its citizens have important interests in keep unauthorized initiatives off the ballot itself that outweigh the burden to Plaintiffs." (Opp. at 21, ECF No. 40.) They posit that the State's "substantial interests" in simplifying the ballot, preventing voter confusion, and maintaining voter confidence in the government and electoral process justify the requirements challenged here.  (*Id*. at 21-22.)

Defendants contend that the numerical and geographic requirements are "supported by the regulatory interest of 'making sure that an initiative has sufficient grass roots support to be placed on the ballot.'" (*Id*. at 22 (quoting *Meyer*, 486 U.S. at 425-26.).) The State contends that this interest is "substantial." (*Id*.)

This Court agrees that the State "has a strong interest in ensuring that proposals are not submitted for enactment into law unless they have sufficient support."  *See Taxpayers United*, 994 F.2d at 297 (6th Cir. 1993); *Buckley*, 525 U.S. at 205 (holding Colorado could "meet the State's substantial interests in regulating the ballot-initiative process" and "ensure grass roots support" by

"condition[ing] placement of an initiative proposal on the ballot on the proponent's submission of valid signatures representing five percent of the total votes cast for Secretary of State at the previous general election.").

The Supreme Court has held that "the State's interest in preserving the integrity of the electoral process and in regulating the number of candidates on the ballot [is] compelling" and that "a state may require a preliminary showing of significant support before placing a candidate on the general election ballot." *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986) (citing *American Party of Texas v. White*, 415 U.S. 767, 782 n. 14 (1974); *Jenness v. Fortson*, 403 U.S. 431 (1971)).

In the instant action, the State's interest in requiring sufficient grassroots support for proposed local initiatives and constitutional amendments to be placed on the ballot is perhaps even more compelling than for candidates because of the nature of those measures. Ohioans have reserved for themselves this right to initiate legislation and propose constitutional amendments. The numerical signature requirements for those initiatives ensures that only those measures supported by a significant number of voters make it on the ballot for enactment, and prevents voter confusion, ballot overcrowding, or frivolous initiatives from earning spots on the ballot. The geographical requirement also ensures that the support is statewide, and not just from Ohio's most populous counties.

Defendants assert that the deadlines for petitions to be submitted "advances the state's interest in providing sufficient time for the Secretary of State to verify signatures, and for that verification to occur in an orderly and fair fashion." (*Id*. at 24 (citing *American Party of Texas v. White*, 415 U.S. 767, 787, fn. 18 (1974).) While this Court agrees that ensuring the Secretary of State—and municipalities for local initiatives—have enough time to verify signatures without

disrupting preparations for the upcoming election is important, the July 1 and July 16 deadlines here, respectively, are not narrowly tailored in light of Plaintiffs' inability to safely circulate petitions in person beginning in mid-March and continuing to present day. *See Esshaki*, 2020 WL 1910154, at *7 (E.D. Mich. Apr. 20, 2020) ("The March 23, 2020 Stay-at-Home Order, for reasons already discussed, effectively halted signature-gathering by traditional means, reducing the available time prescribed by the Michigan Legislature to gather one thousand signatures by twenty-nine days."). Plaintiffs had made significant efforts to qualify their initiatives for the November 3, 2020 general election ballot months before much of Ohio was shutdown due to the virus, prohibiting Plaintiffs from safely collecting signatures in person. Cf. *Morgan v. White*, Case No. 20-C-2189, slip op. (N.D. Ill. May 18, 2020) (Pallmeyer, C.J.) (concluding plaintiffs could not show Illinois' Stay-at-Home Order caused the alleged burden on their ability to collect signatures in support of constitutional amendment rather than their own delay when the only party to begin circulation efforts started after the pandemic the week before filing suit and a month before deadline).

The Court comes to a different conclusion with respect to the numerical and geographical requirements, however. The most significant obstacle to Plaintiffs' alleged ability to meet the numerical and geographic requirements in light of the COVID-19 pandemic and Stay-at-Home Orders is their inability to collect signatures in person and the prohibition on electronic signatures. Based on the above holdings with respect to the submission deadlines, signature requirements, and the witness requirements, the resulting burden imposed by the numerical and geographical requirements is not as severe.

This is consistent with the *Esshaki* court's holding that Michigan did not show it had a compelling interest in enforcing "*the specific numerical requirements* . . . in the context of the

pandemic conditions and the upcoming August primary.") (emphasis in original). *See* 2020 WL 1910154, at *7 (E.D. Mich. Apr. 20, 2020). First, the Court emphasizes the compelling importance of the State's interest in ensuring that initiatives to enact legislation or to amend Ohio's constitution are submitted to Ohio's voters only if they have sufficient grassroots support, not just a "modicum of support" as is true for the candidates. Second, the *Esshaki* court emphasized that the specific signature requirement was not narrowly tailored because it did not account for the plaintiffs' inability to collect signatures in the twenty-nine days in between when Michigan's Stay-at-Home Order went into effect and the statutory deadline. *Id*. at. *7. The court explained that "a state action narrowly tailored to accomplish the same compelling state interest would correspondingly reduce the signature requirement to account for the lost twenty-nine days." *Id*.

In the case *sub judice*, the Court finds that reduction of the numerical and geographical requirements is not warranted given the compelling importance of ensuring the grassroots support for proposed initiatives (and that the support be statewide for constitutional amendments). Further, the Court's decision with respect to other requirements impeding Plaintiffs' ability to meet those requirements—the deadlines, the ink signature requirements, and the witness requirements—will have the effect of tailoring those requirements to the present circumstances. The Court therefore finds that Plaintiffs have established they are likely to succeed on the merits of their challenges to the deadlines for the submission of signatures in Article II § 1a and Ohio Revised Code § 731.28, but not with respect to the numerical and geographical requirements in Article II § 1a and II § 1g and Ohio Revised Code § 731.28.

## B.    Irreparable Injury

Defendants contend that Plaintiffs suffer no injury because they can go into the public and gather signatures.  Plaintiffs disagree, maintaining that their loss of constitutional rights satisfies

the prong of the Rule 65 analysis.  And, the OFRW Intervenors also argue that the "more than $1.5 million spent to qualify their proposal specifically for placement on the November 3, 2020 general election ballot—funds that would have all been expended 'for naught' if OFRW Intervenors cannot submit their proposal in 2020—does" constitute irreparable injury.  Plaintiffs arguments are well taken.

While OFRW Intervenors are correct that "ordinarily, the payment of money is not considered irreparable," when "expenditures cannot be recouped, the resulting loss may be irreparable."  (OFRW Reply at 17, ECF No. 42 (citing *Philip Morris USA, Inc. v. Scott*, 561 U.S. 1301, 1304 (2010)).  The Court, however, need not make that determination here because "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed."  *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (citing *ACLU of Ky. v. McCreary County, Ky.,* 354 F.3d 438, 445 (6th Cir.2003)).  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971)).

**C.**     **Substantial Harm to Others and Public Interest**

The remaining factors, "harm to the opposing party and weighing the public interest . . . merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The State contends enjoining enforcement of Ohio's signature requirements "will allow unfettered and automatic access to the general election ballot for innumerable petitions" and that as a result "Ohio's ballot will be cluttered with proposed initiated statutes, ordinances and constitutional amendments that do not have so much as the minimum level of support otherwise required by law." (Opp. at 27, ECF No. 40.) According Defendants, the "Plaintiffs urge this Court do what the *Esshaki* Court swiftly struck down just last week." (*Id*. at 29.) Defendants further argue

36

that Plaintiffs' requested relief is not in the public interest because the requirements Plaintiffs seek to enjoin ensure ballot integrity and that "[i]mplementing a system that utilizes unwitnessed, anonymous signature gathering invites fraud." (Opp. at 30, ECF No. 40.)

Plaintiffs respond that an injunction would be in the public's interest, and that any harm to the State is outweighed by the burden on Plaintiffs and the public. This Court agrees. Plaintiffs have established a likelihood of success on the merits of their First Amendment claims with respect to some of Ohio's signature requirements, and "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 412 (6th Cir. 2014) (quotation omitted). Conversely, it is not in the public's interest to require Plaintiffs to go out into the public and risk their health and the public's health to collect signatures in person from voters. *See* 2020 WL 1910154, at *9 (E.D. Mich. Apr. 20, 2020).

There is no evidence that electronic signatures would "likely inject fraud into Ohio's petition process[.]" (Opp. at 2, ECF No. 40.) Moreover, Plaintiffs-Intervenors OFSE and OFRW have proposed a detailed system, developed and implemented at their own cost, for gathering, verifying, and submitting electronic signatures. OFRW states it has contracted with DocuSign, "the country's leading company for execution of electronic signatures on legal documents." (Leonard Decl. at ¶ 7, ECF No. 30-1.) They will establish a dedicated website that directs signers to a PDF of the petitions that closely mirrors paper versions and require the signer to provide the last 4 digits of their social security number to verify their identity. (*Id.* at ¶ 8.) The circulator will be the administrator of the on-line petition and will monitor the activity on the website, including for duplicate names and multiple uses of an IP address. (*Id.*) The Secretary of State will be provided the last 4 digits of the social security numbers to authenticate the identity of the signer. (*Id.*) According to OFSE Plaintiffs, "[t]he State would not itself need to implement the system; it would

merely have to accept electronically-signed petitions instead of insisting on wet-ink, physically-witnessed ones. The State already uses this method of verification when it registers voters electronically." (OFSE Reply at 19, ECF No. 43.)

The Court also finds that any burden to Defendants will be outweighed by the burden on Plaintiffs and the public of attempting to comply with the signature requirements as enforced against them in these current circumstances. *Libertarian Party of Illinois v. Pritzker*, No. 20-CV-2112, 2020 WL 1951687, at *4 (N.D. Ill. Apr. 23, 2020). There is no risk that "Ohio's ballot will be cluttered" with unsupported initiatives because the numerical and geographical requirement will not be affected by the Court's ruling. Additionally, this Court's decision is limited to these Plaintiffs, in these particular circumstances, for the November 3, 2020 general election only. This order does not apply to other individuals or ballot issues not before this Court.

The balance of these factors therefore weighs in favor of an injunction.

## V.

Having found Plaintiffs are entitled to emergency injunctive relief, this Court is left to decide how to remedy these constitutional violations. "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017). "In formulating the appropriate remedy, 'a court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case.'" *Garbett v. Herbert*, 2020 WL 2064101, *17 (D. Utah. Apr. 29, 2020) (quoting *Int'l Refugee Assistance Project*, 137 S. Ct. at 2087) (enjoining enforcement of some but not all requirements for candidate to qualify for ballot in light of COVID-19 pandemic).

This Court is without power to modify the requirements set forth in the Ohio Revised Code for local initiatives as sought by the Thompson Plaintiffs in light of the Sixth Circuit's decision in *Esshaki*, staying the district court's "plenary re-writing of the State's ballot-access provisions[.]" 2020 WL 2185553, at *2 (6th Cir. May 5, 2020). The Court will "instruct[] the State to select its own adjustments so as to reduce the burden on ballot access, narrow the restrictions to align with its interest, and thereby render the application of the ballot-access provisions constitutional under the circumstances." *Id*.[3] Defendants shall report their proposed adjustments to the enjoined requirements to the Court by 12:00 pm on Tuesday, May 26, 2020.

While the legislature may remedy the constitutional violations in the Ohio Revised Code, it is without power to amend the Ohio Constitution—all constitutional amendments must be approved by the people of Ohio. *See* Ohio Const. Art. II, § 1a. Neither Defendant LaRose nor the Ohio General Assembly can modify the requirements in the Ohio Constitution that this Court has found unconstitutionally burdens Plaintiffs' First Amendment rights. Defendant LaRose affirmed his understanding of this in correspondence with OFSE Plaintiffs, where he stated he "is not free to modify or to refuse to enforce the explicit constitutional and statutory requirements for initiative petition signature gathering, even in the current crisis" and that "some of the requirements to which [OFSE Plaintiffs] are referring are in Ohio's Constitution which the legislature cannot change on its own. (*See* ECF No. 15-1.)

---

[3] The Court notes that after the Sixth Circuit's decision in *Esshaki*, Michigan agreed to reduce its signature collection requirement by 50%, which is what the district court had previously ordered, extended the filing deadline, and allowed candidates to collect signature images and submit petition sheets electronically. *See* Elections, The Office of Secretary of State Jocelyn Benson (Updated May 8, 2020), https://www.michigan.gov/sos/0,4670,7-127-1633---,00.html.

This Court, however, has the power to remedy those violations. *See Goldman-Frankie v. Austin*, 727 F.2d 603, 608 (6th Cir. 1984) (holding Michigan ballot access requirements, including provision of Michigan constitution, unconstitutional and affirming district court's order placing independent candidate for state office on the ballot after Michigan failed to remedy violations).

The Court therefore orders Defendants to accept electronically-signed and witnessed petitions collected through the on-line signature collection plans proposed by OFRW Plaintiffs and OFSE Plaintiffs as set forth in their briefing and supporting documents and discussed above. (*See* Leonard Decl., ECF No. 30-1; OFSE Reply at 18-19, ECF No. 43.) The Court further orders the parties to meet and confer regarding any technical or security issues to OFSE and OFRW Plaintiffs' on-line signature collection plan. The parties shall submit their findings to the Court by 12:00 pm on Tuesday, May 26, 2020.

## VI.

For the reasons set forth above, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motions for a Preliminary Injunction. (ECF Nos. 4, 15, 17-2.). The Court hereby:

- Enjoins enforcement of the ink signature requirement in Ohio Revised Code § 3501.38(B) and witness requirement in Ohio Revised Code § 3501.38(E) as applied to the Thompson Plaintiffs for the November 3, 2020 general election.

- Enjoins enforcement of the deadline in Ohio Revised Code § 731.28 as to Thompson Plaintiffs for the November 3, 2020 general election.

- Directs Defendants to update the Court by 12:00 pm on Tuesday, May 26, 2020 regarding adjustments to the enjoined requirements "so as to reduce the burden on ballot access." *Esshaki*, 2020 WL 2185553, at *2.

- Enjoins enforcement of the ink signature and witness requirements in Article II § 1g and Ohio Revised Code § 3501.38(B) as applied to OFSE and OFRW Plaintiffs for the November 3, 2020 general election.

- Enjoins enforcement of the deadlines in Article II § 1a of the Ohio Constitution as to OFSE and OFRW Plaintiffs for the November 3, 2020 general election.

- Orders Defendants to accept electronically-signed and witnessed petitions from OFSE and OFRW Plaintiffs collected through the on-line signature collection plans set forth in their briefing and submitting documents.

- Orders Defendants to accept petitions from OFSE and OFRW Plaintiffs that are submitted to the Secretary of State by July 31, 2020.[4]

- Orders OFRW and OFSE Plaintiffs and Defendants to meet and confer regarding any technical or security issues to the on-line signature collection plans. The parties shall submit their findings to the Court by 12:00 pm on Tuesday, May 26, 2020.

**IT IS SO ORDERED.**

**5/19/2020**                                     **s/Edmund A. Sargus, Jr.**
**DATE**                                            **EDMUND A. SARGUS, JR.**
                                                         **UNITED STATES DISTRICT JUDGE**

---

[4] The Court selected this date for OFSE and OFRW Plaintiffs' submission of petitions in part to remedy the loss of time already incurred by Plaintiffs and because the Secretary of State is required to accept signatures until this date. Ohio Const. Art. II § 1g.