**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**


**Chad Thompson, William Schmitt,
and Don Keeney,**

          **Plaintiffs,**

**v.**                                          **Case No. 20-2129**

**Richard "Mike" DeWine,**                     **Judge Sargus**
**in his official capacity as Governor of
Ohio,**

**Stephanie McCloud, in her official capacity
as Director of Ohio Department of
Health,[1]**

**and**

**Frank LaRose, in his official capacity
as Ohio Secretary of State,**

          **Defendants.**


**PLAINTIFFS' RULE 12(c) MOTION FOR
JUDGMENT ON THE PLEADINGS AND RESPONSE TO
DEFENDANTS' RULE 12(b) MOTION TO DISMISS**


OLIVER B. HALL                            MARK R. BROWN
CENTER FOR COMPETITIVE DEMOCRACY     303 East Broad Street
P.O. Box 21090                           Columbus, OH 43215
Washington, D.C. 20009               (614) 236-6590
(202) 248-9294                           (614) 236-6956 (fax)
oliverhall@competitivedemocracy.org      mbrown@law.capital.edu
*Attorneys for Plaintiffs*

---

[1] Ms. McCloud replaced Dr. Acton as the Director of Ohio Department of Health and is automatically substituted for Dr. Acton under Federal Rule of Civil Procedure 25(d).

## **Table of Contents**

Table of Authorities ............................................................................................................ii

Summary of the Argument ............................................................................................. viii

Plaintiffs' Response and Motion...................................................................................... 1

Statement of the Case .................................................................................................... 2

A.  Facts Established through Pleadings, Stipulation and Judicial Notice  ...................................2

B.  Prior Preliminary Proceedings in this Court  .....................................................................12

C.  Post-Stay Developments ..................................................................................................15

1.  Ohio's COVID Restrictions ..............................................................................................15

2.  Evidence Discovered Since the Stay ................................................................................16

3. Developments in the Sixth Circuit: *SawariMedia, LLC v. Whitmer* ....................................19

Argument  ........................................................................................................................21

I.  Defendants' Rule 12(b) Motion to Dismiss Is Improper and Should Be Construed as
a Motion for Judgment on the Pleadings Pursuant to Rule 12(c).  ...........................................21

II.  Defendants are Not Entitled to Judgment on the Pleadings.  ..............................................22

A.  The Case is Not Moot.  ......................................................................................................22

B.  Defendants Are Not Protected By the Eleventh Amendment.  ...............................................27

III.  Plaintiffs Are Entitled to Judgment on the Pleadings Under Rule 12(c).  ............................29

A.  The Interlocutory Decisions In This Case Are Not Binding.  ..................................................29

B.  The Evidence Now in the Record Establishes That Plaintiffs Are Entitled to Relief
Under the Motions Panel's "Exclusion or Virtual Exclusion" Standard.  ....................................31

C.  Plaintiffs Are Entitled to Relief Under Established Sixth Circuit and Supreme Court
Precedent, Including Related Actions Arising Under the COVID Pandemic. ..............................36

Conclusion  ......................................................................................................................43

## Table of Authorities

***Case***                                                                                              ***page***

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ........................................................................23, 36, 37

*Boler v. Earley*, 865 F.3d 391  (6th Cir. 2017) ............................................................................22

*Brown v. Chote*, 411 U.S. 452 (1973) ...........................................................................................23

*Burlington N. R.R. Co.* v. *Huddleston*, 94 F.3d 1413 (10th Cir. 1996)  .....................................6, 21

*Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010) ..........................................31

*City of Angoon v. Hodel,* 803 F.2d 1016 (9th Cir.1986) ................................................................29

*Colvin v. Veterans Admin. Med. Ctr.,* 390 Fed. Appx. 454 (6th Cir. 2010)  ....................................4

*Costco Wholesale Corp. v. Hoen*, 2004 WL 7339619 (W.D. Wash. 2004)  .................................22

*Crawford v. Marion County Election Bd.*, 553 U.S. 181 (2008)  ....................................................36

*Davis v. Federal Election Comm'n*, 554 U.S. 724 (2008)  ..............................................................23

*Democratic Party v. Wisconsin ex rel. La Follette*, 450 U.S. 107 (1981)  ......................................23

*Doe v. DeWine*, 910 F.3d 842 (6th Cir. 2018)  .............................................................................22

*Dunn v. Blumstein,* 405 U.S. 330 (1972)  .....................................................................................24

*East Bay Sanctuary Covenant v. Garland*, 2020 WL 9156716 (9th Cir., April 8, 2021) ............30

*Esshaki* v. *Whitmer*, 813 F. Appx. 170 (6th Cir. 2020)  ...............................................12, 38, 39, 40

*Esshaki v. Whitmer*, 455 F. Supp.3d 367 (E.D. Mich. 2020) ....................................................38, 39

*Esshaki v. Whitmer*, 461 F. Supp.3d 646 (E.D. Mich. 2020) ............................................14, 21, 41

*Frank v. Walker*, 819 F.3d 384, 388 (7th Cir. 2016)  ....................................................................28

*Golden State Transit Corp. v. City of Los Angeles,* 754 F.2d 830 (9th Cir. 1985) ......................30

*Goldstein v. Sec. of the Commonwealth*, 142 N.E. 3d 560 (Mass. 2020)  ......................................35

*Graveline v. Benson*, 992 F.3d 524 (6th Cir. 2021) .................................................................23, 24

*Green Party of Md. v. Hogan*, No. 1:20-cv-1253 (D. Md. June 19, 2020) ....................................35

*Green Party of Tennessee v. Hargett*, 791 F.3d 684 (6th Cir. 2015) ............................................37

*Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979) ...................................36

*Innovation Law Lab v. Wolf*, 951 F.3d 1073 (9th Cir. 2020) ........................................................29

*Libertarian Party of Ilinois v. Pritzker*, 455 F. Supp.3d 738 (N.D. Ill. 2020),
*aff'd, Libertarian Party of Illinois v. Cadigan*, 2020 WL 5104251 (7th Cir. Aug. 20, 2020) ......35

*Libertarian Party of Kentucky v. Grimes*, 835 F.3d 570 (6th Cir. 2016) ......................................37

*Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579 (6th Cir. 2006) ............................25, 34, 37

*Libertarian Party of Ohio v. Husted*, 831 F.3d 382 (6th Cir. 2016) ........................................25, 26

*Martinez v. Regency Janitorial Services*, 2011 WL 4374458 (E.D. Wis. 2011) .........................22

*Merchants Home Delivery Service Inc. Hall & Co., Inc.*, 50 F.3d 1487 (9th Cir. 1995) .............22

*Moore v. Ogilvie*, 394 U.S. 814 (1969) ........................................................................................22

*Morrow v. South*, 540 F. Supp. 1104(S.D. Ohio 1982) .................................................................28

*Norman v. Reed*, 502 U.S. 279 (1992) ..........................................................................................23

*Overall v. Ascension*, 23 F. Supp.3d 816 (S.D. Mich. 2014) ..........................................................4

*Pension Ben. Guar. Corp. v. East Dayton Tool and Die*, 14 F. 3d 1122 (6th Cir. 1994) .............28

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) ............................24, 42, 43

*Rosario v. Rockefeller*, 410 U.S. 752 (1973) ................................................................................23

*Russell v. Lundergan-Grimes*, 784 F.3d 1037 (6th Cir. 2015) .....................................................22

*Sanders v. Wal-Mart Stores East*, 2018 WL 3190915 (M.D. Ala. 2018) .....................................21

*SawariMedia, LLC* v. *Whitmer*, 963 F.3d 595 (6th Cir. 2020) ..........................................13, 19, 40

*SawariMedia, LLC v. Whitmer*, 466 F. Supp.3d 758 (E.D. Mich. 2020) .........................19, 40, 1

*SawariMedia, LLC v. Whitmer*, 2020 WL 6580461 (E.D. Mich. 2020) .......................................13

*Schmitt v. LaRose*, 933 F.3d 628 (6th Cir. 2019) ..................................................................2, 4, 32

*South Bay Pentecostal Church v. Newsom*, 141 S. Ct. 716 (2021) ..................................10, 25, 26

*Stabile v. United Recovery Systems*, 2011 WL 5578981 (E.D.N.Y. 2011) ...................................21

*Storer v. Brown*, 415 U.S. 724 (1974) .......................................................................23, 28, 36, 38

*Tandon v. Newsom*, 141 S. Ct. 1294 (2021) ...................................................................10, 11, 24

*Technical Publishing Co. v. Lebhar–Friedman, Inc.,* 729 F.2d 1136 (7th Cir.1984) ..................29

*Thompson v. DeWine*, No. 20-1072 (U.S., April 19, 2021) ...........................................................1

*Thompson v. DeWine*, 976 F.3d 610 (6th Cir. 2020) .............................................................1, 15

*Thompson v. DeWine*, 959 F.3d 804 (6th Cir. 2020) .......................................................... passim

*Thompson v. DeWine*, 461 F. Supp.3d 712 (S.D. Ohio 2020) .............................................. passim

*University of Texas v. Camenisch*, 451 U.S. 390 (1981) ............................................................29

*United States v. Virginia*, 516 U.S. 910 (1995) ........................................................................31

*Virginia Military Institute v. United States*, 508 U.S. 946 (1993) ...............................................31

*Wilcox v. United States*, 888 F.2d 1111 (6th Cir. 1989) ...........................................................30

*Williams v. Methodist Healthcare-Memphis Hospitals,*
2010 WL 11493261 (W.D. Tenn. 2010) .....................................................................................22

### Federal Rules of Civil Procedure

Rule 12(b)(1) ........................................................................................................................1, 21

Rule 12(b)(6) ........................................................................................................................1, 21

Rule 12(c) .......................................................................................................................1, 21, 22

Rule 54(c) ...............................................................................................................................28

### Federal Rules of Evidence

 Fed. R. Evid. 201(b) ...................................................................................................................4

### Ohio Statutes

O.R.C. § 3511.04 ....................................................................................................................26

O.R.C. § 3511.16 ................................................................................................26


*Miscellaneous*

Ben Axelrod, *Ohio lifts COVID-19 curfew effective Thursday; ends last call restrictions*, WKYC, Feb. 11, 2021 ...............................................................................................32

Brief of Direct Democracy Scholars, The Initiative and Referendum Institute, and Citizens in Charge as Amici Curiae Supporting Petitioners, *Thompson v. DeWine*, No. 20-1072 (U.S.), March 8, 2021 ......................................................................2, 5, 18, 19, 35, 42

Centers for Disease Control and Prevention, Covid-19, April 29, 2021 ......................................33

Centers for Disease Control and Prevention, Press Release, *CDC calls on Americans to wear masks to prevent COVID-19 spread*, July 14, 2020 ....................................14

*Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times, July 7, 2020 ........................9

Ian Cross, *Gov. DeWine Clarifies Enforcement, Reporting of Stay-at-home Order Violations*, News5Cleveland.com, Mar. 23, 2020 ...............................................................3

Director's Order, Re: Director's Amended Order for Social Distancing, Facial Coverings and Non-Congregating, April 8, 2021 ...........................................................................15, 16

Director's Order to Extend the Expiration Date of Various Orders, June 30, 2020 ......................8

Director's Order: First Amended Revised Order to Limit and/or Prohibit Mass Gatherings in the State of Ohio, with Exceptions, March 2, 2021 ...................................................10

Director's Order Rescinding Various Orders, April 5, 2021 .......................................................10

Director's Second Order to Extend the Expiration Date of Various Orders, July 7, 2020 ..........8, 9

Director's Stay at Home Order, March 22, 2020 ..........................................................................3

Director's Stay at Home Tonight Order, Nov. 19, 2020 ...............................................................9

Director's Stay at Home Tonight Order, Jan. 27, 2021 ............................................................9, 10

T. DONOVAN, ET AL., STATE AND LOCAL POLITICS, INSTITUTIONS AND REFORM (4th ed. 2015) ..17

Ex. Order 2020-01D, Declaring State of Emergency ..................................................................3

Richard L. Hasen, *Direct Democracy Denied: The Right to Initiative During a Pandemic*, 2020 U. Chi. L. Rev. Online (June 26, 2020) ...................................................12, 13, 14, 15

Kyle Jaeger, Four *More Ohio Cities Will Vote On Marijuana Decriminalization This November*, Marijuana Moment, Aug. 13, 2020 ...................................................................................4

Amy Liu & Reniya Dinkins, *Report: It's not just Trump and Biden: State and local ballot measures could have a big impact on community recovery*, Brookings, Oct. 31, 2020 ..............18

Laura Mazade, *What Does the Stay-at-home Order Mean for Ohio?*, Cincinnati Enquirer, Mar. 22, 2020 ...................................................................................................................................3

Michigan Executive Order 2020-42 FAQs ...................................................................40

NCSL National Conference of State Legislatures, Statewide Ballot Measures Database (Nov. 12, 2020) ...........................................................................................................................17

*Ohio Coronavirus Map and Case Count*, N.Y. Times, July 7, 2020 .............................9

Ohio Dep't of Health, Dir.'s Stay Safe Ohio Order Re: Dir.'s Order that Reopens Businesses, with Exceptions, and Continues a Stay Healthy and Safe at Home Order, Apr. 30, 2020 .........6, 7

Ohio Department of Health, COVID-19 Dashboard, April 29, 2021 ...........................33

Ohio Department of Health Director's Order Re: Director's Updated and Revised Order for Business Guidance and Social Distancing, May 29, 2020 ........................................7, 8

Ohio Department of Health, Covid-19 Update: School Guidelines, Public Health Advisory System, July 2, 2020 ...................................................................................................8

Ohio 2020 Elections Calendar ...................................................................................26

Rob Stein, *The Future Of The Pandemic In The U.S.: Experts Look Ahead*, NPR, March 24, 2021 ...................................................................................................11

Gary A. Warner, *Pandemic leads to unusually short list of ballot measures*, The Bulletin, July 31, 2020 ...................................................................................................................18

Amanda Zoch, *2020 Ballot Measures: A Preview*, National Conference of State Legislatures, Aug. 18, 2020 ...................................................................................................................18

### Summary of the Argument

This case is before the Court following the Supreme Court's denial of interlocutory review of the Sixth Circuit's reversal of this Court's preliminary injunction. *See Thompson v. DeWine*, No. 20-1072 (U.S., April 19, 2021); *see Thompson v. DeWine*, 461 F. Supp.3d 712 (S.D. Ohio, May 19, 2020), *rev'd*, 976 F.3d 610 (6th Cir., Sept. 16, 2020).  Defendants have now improperly moved for dismissal pursuant to Rule 12(b) long after the time for filing pleadings has closed. The Court should construe Defendants' filing as a motion for judgment on the pleadings under Rule 12(c) and deny it.  Plaintiffs – not Defendants – are entitled to judgment on the pleadings.

Defendants' assertion that this case is moot has no merit. It is well-settled that constitutional challenges to election laws fall into the "capable of repetition, yet evading review" exception to the mootness doctrine.  That is the case here.  The 2020 election cycle ended before Plaintiffs could litigate their case to a final judgment, and the issues they raise are reasonably likely to recur.  Indeed, they are recurring now: Plaintiffs are suffering the same injury in the 2021 election cycle that they suffered in 2020.  Plaintiffs are therefore entitled to continue litigating their claims for relief.

Defendants' assertion that the Eleventh Amendment bars Plaintiffs from seeking relief also has no merit.  Defendants are simply incorrect that Plaintiffs seek relief from past violations only, and not from ongoing violations.  The in-person petitioning requirements that Plaintiffs challenge here are injuring them now, in 2021, just as they injured Plaintiffs in 2020.  It is also well-settled that Plaintiffs are entitled to seek relief for such injuries.

As to the merits, Defendants' motion suffers from a critical defect that undermines their entire position: contrary to Defendants' assumption, the interlocutory decisions in this case are

not binding on this Court.  A grant or denial of preliminary relief is not a final decision on the merits, has no res judicata or collateral estoppel effect, and does not constitute the law of the case.  Consequently, Defendants must do more than rely on the Sixth Circuit's decisions at the preliminary stage of these proceedings: they must show that they are entitled to prevail at this stage of the proceedings.  This Defendants fail to do.

Plaintiffs, by contrast, have cited numerous undisputed facts that were not in the record at the preliminary stage of this proceeding, which demonstrate that they are entitled to relief.  In particular, these facts establish that Plaintiffs satisfy the "exclusion or virtual exclusion" standard that the Sixth Circuit applied to determine whether the burden on Plaintiffs' rights is severe.  These facts also establish that Ohio could adopt any number of less burdensome alternatives that would alleviate the severity of the burden on Plaintiffs' rights while protecting Ohio's legitimate regulatory interests.  Based on these new facts, therefore, Plaintiffs prevail.

Finally, Plaintiffs also prevail under long-standing Sixth Circuit and Supreme Court precedent applying the *Anderson-Burdick* analysis to invalidate statutes based upon a fact-specific assessment of their impact as applied in combination.  These cases reject "litmus test" analyses and require that courts take account of the particular evidence in each case – including the new facts Plaintiffs cite here – to determine whether the burdens imposed by challenged restrictions are justified by the State's asserted interests.  In this case, the evidence shows that Defendants' strict enforcement of Ohio's in-person petitioning requirements cannot survive that analysis.  The burden on Plaintiffs' rights is severe and Defendants do not and cannot show that Ohio's regulatory interests demand strict compliance with those requirements in the context of the COVID pandemic.  The Sixth Circuit's decisions in materially indistinguishable cases arising

from the COVID pandemic bolster that conclusion. Like the plaintiffs in those cases, Plaintiffs here are entitled to relief.

## **Plaintiffs' Response and Motion**

On Monday, April 26, 2021, the Supreme Court denied interlocutory certiorari in the above-styled matter. *See Thompson v. DeWine*, No. 20-1072 (U.S., April 19, 2021). Plaintiffs had requested that the Supreme Court review on an interlocutory basis the Sixth Circuit's reversal, *Thompson v. DeWine*, 976 F.3d 610 (6th Cir., Sept. 16, 2020), of this Court's preliminary injunction. *See Thompson v. DeWine*, 461 F. Supp.3d 712 (S.D. Ohio, May 19, 2020).

Following the Supreme Court's denial of certiorari, Plaintiffs on April 21, 2021 moved for a status conference. *See* Motion, R.65. The Court granted that motion on April 22, 2021, *see* Order, R.66, and scheduled a conference for April 28, 2021. The day before that conference, Defendants moved to dismiss under Rules 12(b)(1) and 12(b)(6). *See* Motion to Dismiss, R.68.

At the conference, Plaintiffs were directed to file their Response to Defendants' motion and their own dispositive motion under Rule 12(c) within seven days. Defendants were then afforded ten days from the filing of Plaintiffs' Rule 12(c) motion to respond. Plaintiffs hereby respond to Defendants' Rule 12(b) motion, suggest that it be treated as a Rule 12(c) motion, and proffer their own motion for judgment on the pleadings under Rule 12(c).

Plaintiffs respectfully move the Court to declare unconstitutional Ohio's strict enforcement of its wet, witnessed signature requirement and its July signature-submission deadline for general elections held in November during the continuing COVID crisis. Plaintiffs further respectfully request a permanent injunction (1) prohibiting enforcement of Ohio's in-person, 'wet,' witnessed signature collection requirements, and (2) prohibiting enforcement of Ohio's July deadline during the ongoing COVID crisis, and (3) prohibiting enforcement of Ohio's numerical requirements. This Court preliminarily enjoined the first two of these

requirements in the prior proceedings. *See Thompson*, 461 F.Supp.3d at 739. As set forth below, new evidence demonstrates that relief is warranted now from all three .

### Statement of the Case

**A.     Facts Established Through Pleadings, Stipulations and Judicial Notice**

Plaintiffs Chad Thompson, William Schmitt and Don Keeney are Ohio residents who attempted to circulate marijuana decriminalization initiatives in cities throughout Ohio for the November 3, 2020 general election. Verified Complaint, R. 1, Page ID # 2.  They have circulated these same initiatives in prior elections in Ohio. *See Schmitt v. LaRose*, 933 F.3d 628 (6th Cir. 2019). They continue to circulate these initiatives today in an effort to have them placed on local election ballots for the November 2, 2021 election. *See* Chad Thompson Declaration (Attachment 1). The problem is Ohio's strict enforcement of its in-person petitioning requirements during the COVID-19 pandemic. Unlike many other states throughout the nation which have adopted reasonable modifications that enable citizens to comply with their petitioning procedures, *see* Brief of Direct Democracy Scholars, The Initiative and Referendum Institute, and Citizens in Charge as Amici Curiae Supporting Petitioners, *Thompson v. DeWine*, No. 20-1072 (U.S.), March 8, 2021, at 15 ("many states have temporarily modified or made such modest changes to ballot qualification rules to accommodate public health orders stemming from the coronavirus") (hereinafter "Scholars' Brief") (Attachment 2), Ohio continues to demand strict compliance with its signature requirements, its "wet" in-person petitioning requirements and its filing deadlines, notwithstanding the upheaval and drastic restrictions on daily  life and activities caused by the pandemic. Ohio thus blocked Plaintiffs from placing their initiatives on dozens of local ballots in 2020 and, in the absence of judicial relief, it will do the same in 2021.

2

On February 27, 2020—before the COVID-19 crisis fully hit Ohio—Plaintiffs properly filed their proposed initiatives with several Ohio cities in order to begin collecting signatures. Stipulated Facts, R. 35, Page ID # 469. (Ohio law prohibits signature collection until the proposed initiative is duly filed.) On March 14, 2020, however, Ohio's governor declared a state of emergency, see Ex. Order 2020-01D, Declaring State of Emergency,[1] and the following week on March 22, 2020 Ohioans were ordered to stay home. Gatherings were banned. *See* Director's Stay at Home Order, March 22, 2020.[2]

Ohio was one of the first states in the nation to declare a state of emergency and issue orders prohibiting gatherings. *Id*. The initial orders banned, with limited exceptions, all gatherings of 50 or more persons, which are the primary events that circulators rely on to gather signatures. *Id*. at Page ID # 472. Subsequent orders included criminal penalties and directed all Ohioans to "stay at home or at their place of residence," to maintain at least a six-foot social distance between themselves and others, and to avoid altogether gatherings of ten or more people. *See* Ian Cross, *Gov. DeWine Clarifies Enforcement, Reporting of Stay-at-home Order Violations*, News5Cleveland.com, Mar. 23, 2020, https://tinyurl.com/yxgym fga; Laura Mazade, *What Does the Stay-at-home Order Mean for Ohio?*, Cincinnati Enquirer, Mar. 22, 2020, https://tinyurl.com/yyb6vfjt.  These orders did not exempt circulators, and like everyone else, circulators stayed home as they were required by law to do.

Well-intentioned and necessary as they were, the Governor's restrictions combined with the risks posed by COVID and Ohio's strict enforcement of its in-person petitioning requirements stopped Ohio's initiative process in its tracks. Although it was not known at the time of the

---

[1] https://coronavirus.ohio.gov/static/publicorders/Executive-Order-2020-01D.pdf

[2] https://coronavirus.ohio.gov/static/publicorders/DirectorsOrderStayAtHome.pdf.

preliminary injunction hearing or the interlocutory appellate proceedings in the Sixth Circuit that followed, without injunctive relief (which was stayed by the Sixth Circuit) Plaintiffs succeeded in placing only 4 of the 73 initiatives they anticipated placing on local ballots during the November 3, 2020 general election – and those initiatives were exclusively in small villages where the signature requirements were correspondingly low. *See* Declaration of Chad Thompson (Attachment 1).[3] *See generally* Kyle Jaeger, *Four More Ohio Cities Will Vote On Marijuana Decriminalization This November*, Marijuana Moment, Aug. 13, 2020, https://tinyurl.com/yysg9rxv. Plaintiffs are practiced in the art of placing their marijuana decriminalization initiatives on local ballots in Ohio, *see*, *e.g.*, *Schmitt v. LaRose*, 933 F.3d 628 (6th Cir. 2019) (reporting that these same plaintiffs successfully placed these initiatives on ballots in Ohio during the 2018 election), and their anticipated success rates in terms of placing initiatives is therefore quite reasonable.

Knowing that the four villages' populations were quite small and would require only a few dozen signatures, and because of their past experiences with their initiatives, Plaintiffs understood that they could place their initiatives on these four small villages' 2020 ballots. *See* Declaration of Chad Thompson (Attachment 1). Plaintiffs understood that they could personally and carefully go door-to-door to gather enough signatures in these villages. It is extremely important to keep political momentum (even during times of crisis), so Plaintiffs braved the risks and did their best.

---

[3] The Court may take judicial notice of this because it is public record in Ohio. *See Overall v. Ascension*, 23 F. Supp.3d 816, 824-25 (S.D. Mich. 2014) ("The Court may take judicial notice of public documents and government documents because their sources 'cannot reasonably be questioned.'" (quoting Fed. R. Evid. 201(b) and citing *Colvin v. Veterans Admin. Med. Ctr.,* 390 Fed.Appx. 454, 456 (6th Cir.2010)).

In contrast to this limited success, Plaintiffs were forced to forego their efforts in larger cities like Akron. "Historically, to obtain the necessary number of signatures and gain support for the ballot initiatives, canvassers often approach bystanders at large-scale or community events— e.g., parades—or have a dialogue with citizens on public streets."  Scholars' Brief at 13. The "[p]ublic health orders in Ohio … during the pandemic, however, prohibit[ed] most large and public gatherings, direct[ed] a six-foot social distance between individuals from different households, and instruct[ed] residents to stay home. These measures—well-intentioned, important, and necessary—nonetheless severely restrict[ed] initiative proponents' ability to satisfy ballot qualification rules." *Id*.

In any municipality larger than a small village, going door-to-door therefore simply cannot succeed. Public gatherings are the prime collection grounds. Volunteers or paid circulators are needed. "[Q]ualifying initiative petitions is an expensive and difficult task. Signature gathering is often the largest expense for direct democracy campaigns." Scholars' Brief at 11-12. Because of COVID, the Governor's emergency orders restricting gatherings, and the various social distancing mandates, there were no festivals, fairs, or parades during the 2020 election cycle, and no meaningful way for Plaintiffs to qualify their initiatives in the vast majority of cities in Ohio. *See generally* Stipulated Facts, R. 35, Page ID # 469–470. As stated by a nationally renowned collection of experts, "the pandemic and resulting health-related measures (which will certainly continue for months, if not years) has made the initiative and referendum process severely burdensome." Scholars' Brief at 13. "Prohibitions on large gatherings, and fears associated with such gatherings, have removed the most historically important forum for the exercise of direct democracy. Moreover, the pandemic has reduced the

number of available paid and volunteer signature gatherers who may have at-home obligations (e.g., childcare) or who worry about exposure to coronavirus." *Id*. at 14.

Defendants admitted all of this not only in their Stipulations but through their failure to answer the Complaint:[4] Specifically, Defendants admitted (at least until April 30, 2020, when after this litigation commenced they added an exception to their emergency orders for circulation) that:

> because of the presence of the pandemic in Ohio, the restrictions on businesses, the prohibitions on gatherings, the requirements of distancing, and the mandatory stay at home order*, it is literally impossible for people outside the same family unit to solicit others for signatures needed to support the initiative petitions needed to place initiatives and referenda on Ohio's November 2020 election ballot*.

Verified Complaint, R.1, Page ID # 14 (emphasis added). They further admitted that "[g]athering in-person signatures in Ohio under the current circumstances is *not only illegal* under Ohio law but risks spreading COVID-19." *Id*. (emphasis added).

These expert opinions and admissions present new evidence; they were not available during the preliminary injunction proceedings because the time for answering the Complaint had not yet expired. They are critical to this case and reflect not only studied and practiced perceptions of the crisis, but also Defendants' appreciation of how terrible the crisis was when the Complaint was filed. Before April 30, 2020 Defendants could not deny that circulators were expected and required to stay home just like everyone else. They therefore admitted it and then, on April 30, 2020, simply changed the emergency order.

Defendants not only modified their shutdown order, but explicitly adopted an exception for "petition or referendum circulators." Ohio Dep't of Health, Dir.'s Stay Safe Ohio Order Re:

---

[4] *See Burlington N. R.R. Co.* v. *Huddleston*, 94 F.3d 1413, 1415 (10th Cir. 1996) ("By failing to submit an answer or other pleading denying the factual allegations of Plaintiff's complaint, Defendant admitted those allegations, thus placing no further burden upon Plaintiff to prove its case factually.").

Dir.'s Order that Reopens Businesses, with Exceptions, and Continues a Stay Healthy and Safe at Home Order, Apr. 30, 2020, https://tinyurl.com/y7s6cre2.[5] This is further proof that prior to April 30, 2020, circulators were required by law to stay home just like everyone else. And even though circulators were apparently not prohibited from collecting signatures after that date, public gatherings were still prohibited and social distancing was still required. Door-to-door solicitation was all that was now realistically available (it was not before April 30, 2020), and homeowners were not overly eager to meet strangers on their steps.

As discussed below, *see infra* at page 12, this Court properly recognized Plaintiffs' dilemma and duly enjoined Ohio's in-person signature requirement (as well as its July 16 deadline). A motions panel on the Sixth Circuit stayed the injunction, however, and Plaintiffs were thus forced to deal with COVID as best they could in hopes that the motions panel was correct about COVID dissipating and Ohio opening up. *See Thompson v. DeWine*, 959 F.3d 804, 810 (6th Cir. 2020) ("What's more, Ohio is beginning to lift their stay-at-home restrictions.").

Unfortunately, the motions panel's optimistic prediction proved wrong. COVID did not quit and Ohio did not open up. Just three days after the Sixth Circuit stayed this Court's preliminary injunction, on May 29, 2020 Ohio extended its emergency bans on gatherings and distancing requirements until July 1, 2020. *See* Ohio Department of Health Director's Order Re: Director's Updated and Revised Order for Business Guidance and Social Distancing, May 29, 2020.[6] Like the many emergency orders before it, this May 29, 2020 extension allowed some businesses to remain open or re-open in limited fashions (including requiring social distancing), continued to absolutely prohibit "[a]ll public and private gatherings of greater than 10 people

---

[5] The Court may take judicial notice of theses subsequently adopted emergency orders as public records.

[6] https://coronavirus.ohio.gov/static/publicorders/revised-business-guidance-sd.pdf.

occurring outside a single household and connected property … except for the limited purposes permitted by Orders of the Director of Health," and required physical distancing in all gatherings that were allowed. The only "gathering" exceptions were for (1) weddings (with limitations) and funerals, (2) "religious facilities, entities and groups and religious gatherings," (3) "First Amendment protected speech," (4) "petition or referendum circulators," and (5) "activity by the Media." *Id*. Further, the May 29, 2020 order reiterated that all "indoor family entertainment businesses and venues" were to remain closed until at least July 1, 2020, a date that was later extended indefinitely. *Id*.

"[E]ntertainment venues" continued to include "auditoriums, stadiums, [and] arenas," where signature collection is common, efficient and productive. *Id*. Closing these venues meant there would be no sporting events, concerts, rallies, or celebrations that make mass signature collection possible. On top of those closings, Ohio's emergency orders, including its May 29, 2020 orders, expressly prohibited "parades, fairs, [and] festivals." *Id*. Coupled with the other gathering bans, the May 29, 2020 order necessarily spelled the end to meaningful in-person signature collection in Ohio before the November election. Far from lifting its restrictions, Ohio extended them throughout the summer of 2020 and into the fall.

On June 30, 2020, for example, Ohio extended the terms of the prohibitions found in its various emergency orders until July 7, 2020. *See* Director's Order to Extend the Expiration Date of Various Orders, June 30, 2020.[7] Then, on July 7, 2020 Ohio extended these continuing emergency restrictions indefinitely; they were left in force "until the State of Emergency declared by the Governor no longer exists, or the Director of the Ohio Department of Health rescinds or modifies the Order." Director's Second Order to Extend the Expiration Date of

---

[7] https://coronavirus.ohio.gov/static/publicorders/Extend-ExpirationDate-Various-Orders.pdf.

Various Orders, July 7, 2020.[8]  Also on July 7, 2020, the Governor announced new, additional masking restrictions on the public gatherings throughout Ohio that were allowed. *See* Ohio Department of Health, Covid-19 Update: School Guidelines, Public Health Advisory System, July 2, 2020.[9] As a result, planned re-openings of public places and events across Ohio were canceled.

By July 2020, the COVID crisis in America and Ohio had exploded. According to the New York Times, on July 7, 2020 COVID-19 "[c]ase numbers are surging throughout much of the United States, including in several states that were among the first to reopen." *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times, July 7, 2020.[10]  Included among the "states [that] have had recent growth in newly reported cases over the last 14 days" was Ohio. *Id*. In Ohio in July 2020 "[t]here have been at least 57,956 cases of coronavirus," and "[a]s of Tuesday morning [July 7, 2020], at least 2,927 people had died." *Ohio Coronavirus Map and Case Count*, N.Y. Times, July 7, 2020.[11]

Once winter came, things only got worse. On November 19, 2020, Governor DeWine's Department of Health went so far as to enact a statewide curfew, *see* Director's Stay at Home Tonight Order, Nov. 19, 2021,[12] a curfew that was repeatedly extended, *see*, *e.g*., Director's Stay

---

[8] https://coronavirus.ohio.gov/static/publicorders/Second-Order-ExtendExp-Date-Various-Orders.pdf.

[9] https://coronavirus.ohio.gov/wps/portal/gov/covid-19/resources/newsreleases-news-you-can-use/school-guidelines-public-health-advisorysystem.

[10] https://www.nytimes.com/interactive/2020/us/coronavirus-uscases.html?action=click&module=Top%20Stories&pgtype=Homepage.

[11] https://www.nytimes.com/interactive/2020/us/ohio-coronaviruscases.html.

[12] https://coronavirus.ohio.gov/static/publicorders/health-order-encouraging-ohioans-to-stay-home.pdf.

at Home Tonight Order, Jan. 27, 2021,[13] and left in place until it was rescinded on February 11, 2021.

As for Ohio's ban on gatherings of more than 10 people, it was extended on March 2, 2021, *see* Director's Order: First Amended Revised Order to Limit and/or Prohibit Mass Gatherings in the State of Ohio, with Exceptions, March 2, 2021[14] ("All public and private gatherings of greater than 10 people occurring outside a single residence and the real estate on which it is located, or an apartment, condominium, or dormitory living unit are prohibited."), and extended again until April 5, 2021 when it was finally rescinded, *see* Director's Order Rescinding Various Orders, April 5, 2021,[15] only to be replaced by the most recent iteration of restrictions put in place on April 8, 2021 (which is described below).

COVID continued to inflict misery upon the peoples of the world and in the United States throughout the spring and summer of 2020. It continued to prevent meaningful signature collection during the fall of 2020 and winter of 2021. Little relief from COVID and the governments' regulation has come as late as April 9, 2021, as demonstrated by the Supreme Court's action in *Tandon v. Newsom*, 141 S. Ct. 1294 (2021) (ordering emergency relief because of COVID and government's restrictions); *See South Bay Pentecostal Church v. Newsom*, 141 S. Ct. 716, 720 (2021) (Gorsuch, J.) ("As this crisis enters its second year—and hovers over a second Lent, a second Passover, and a second Ramadan—it is too late for the State to defend extreme measures with claims of temporary exigency, if it ever could.").

---

[13] https://coronavirus.ohio.gov/static/publicorders/fourth-amended-stay-safe-tonight-order.pdf.

[14] https://coronavirus.ohio.gov/static/publicorders/first-amended-revised-order-for-mass-gatherings.pdf.

[15] https://coronavirus.ohio.gov/static/publicorders/directors-order-rescinding-various-orders.pdf.

Ohio is still subject to emergency shut-down orders of various kinds. Ohio has not opened up and has certainly not returned to normal. Even the most optimistic experts worry today that COVID will continue and even resurge in various community "hot spots" across the United States over the summer of 2021. Many fear that it will return in full bloom as a "new winter surge" across the United States and kill tens of thousands more. *See* Rob Stein, *The Future Of The Pandemic In The U.S.: Experts Look Ahead*, NPR, March 24, 2021.[16] No one really knows what COVID holds for the future. The present, however, has happened; Ohio remains in the grip of COVID and its citizens remain under severe restrictions upon their daily activities. By continuing to demand strict compliance with its in-person petitioning requirements under these extraordinary and extreme circumstances, Governor DeWine has unilaterally terminated the initiative process in Ohio. Without judicial relief, Ohio's functioning form of popular democracy is dead.

The underlying contagiousness and severity of the COVID-19 virus remains a threat and will continue to impose a severe burden on future signature gathering efforts for the November 2021 election. Plaintiffs continue in their quest to place their initiatives on the 70-plus municipalities initially targeted. Meanwhile, the deadline for signatures in that election, like that for the November 2020 general election, is mid-July 2021. Plaintiffs continue to experience irreparable harm and, like the plaintiffs in the April 9, 2021 *Tandon* case decided by the Supreme Court, are desperately in need of injunctive relief. *See Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021) (recognizing that in the face of COVID the plaintiffs "are irreparably harmed by the loss of free exercise rights 'for even minimal periods of time'".)

---

[16] https://www.npr.org/sections/health-shots/2021/03/24/976146368/the-future-of-the-pandemic-in-the-u-s-experts-look-ahead.

**B.  Prior Preliminary Proceedings in This Court**

On April 27, 2020, Plaintiffs filed this action requesting a temporary restraining order and preliminary injunction against strict enforcement of Ohio's in-person petitioning requirements. Verified Complaint, R.1. On May 19, 2020, this Court correctly applied the First Amendment's *Anderson-Burdick* framework and the Sixth Circuit's decision in *Esshaki* v. *Whitmer*, 813 F. Appx. 170 (6th Cir. 2020), to conclude that the combination of Ohio's strict enforcement of its petitioning requirements and the pandemic "severely burden [Petitioners'] First Amendment rights *as applied here*. . . ." *Thompson v . DeWine*, 461 F. Supp. 3d 712, 731 (S.D. Ohio 2020) (emphasis original). In an opinion praised by leading election law expert Professor Richard Hasen, the Court "was right to see that normal ballot qualification rules can impose a severe First Amendment burden on direct democracy participants under pandemic conditions." Richard L. Hasen, *Direct Democracy Denied: The Right to Initiative During a Pandemic*, 2020 U. Chi. L. Rev. Online (June 26, 2020).[17]

The District Court accordingly "entered a preliminary injunction in [Plaintiffs'] favor (1) prohibiting enforcement of the in-person, 'wet,' witnessed signature collection requirements, (2) prohibiting enforcement of the July 16, 2020 deadline for the submission of signatures, and (3) direct[ing] 'Defendants to update the Court by 12:00 pm on Tuesday, May 26, 2020 regarding adjustments to the enjoined requirements.'" *Thompson*, 461 F.Supp.3d at 739. Professor Hasen stated in this regard that the District Court "did a good job of trying to put the plaintiffs in the position they would have been in if there had been no pandemic." Hasen, *supra*. "[F]ollowing the Sixth Circuit precedent in the *Esshaki* case," moreover, Hasen observed that "the district court

---

[17] https://lawreviewblog.uchicago.edu/2020/06/26/pandemic-initiative-hasen/.

gave state officials maximum flexibility to cure the constitutional defects created by the confluence of the coronavirus and state law." *Id.*

On May 26, 2020, the Sixth Circuit stayed this Court's preliminary injunction. *Thompson v. DeWine*, 959 F.3d 804 (6th Cir. 2020). In doing so, it applied a singular "total exclusion" litmus test to decide whether burdens are severe under the *Anderson-Burdick* framework. *Id.* at 808. "Dismissing the realities of how the pandemic had essentially ended successful petitioning activity, the [Sixth Circuit] held the law imposed only a minor burden on plaintiffs." Hasen, *supra*. The panel relied not only on this unprecedented test, it also misread the facts in *Esshaki*.

For instance, the panel concluded that because "Michigan's stay-at-home orders remained in place through the deadline for petition submission," *Thompson*, 959 F.3d at 809, the circulators in Michigan were precluded from collecting signatures thereafter and were left "with only the signatures that they had gathered to that point." *Id.* As explained below, this distinction proved important to the panel's rationale for later distinguishing both *Esshaki* and *SawariMedia, LLC* v. *Whitmer*, 963 F.3d 595, 596 (6th Cir. 2020), in its September 16, 2020 reversal of this Court's preliminary injunction. *See infra* at pages 38-40.

It is far from clear, however, that the record in *Esshaki* supports the panel's distinction. *See infra* at pages 38-40. In fact, the District Court's findings in *Esshaki* appear to contradict that distinction. A co-plaintiff (Hawkins) of Esshaki's in that case had collected 3000 signatures before Michigan's first Stay-at-Home Order was announced, the District Court found, and then collected an additional 1283 signatures <u>after</u> that Order (without any formal exception for constitutionally protected activities) went into place. This allowed her to meet the April 21, 2020

deadline. *Esshaki v. Whitmer*, 461 F. Supp.3d 646, 648 (E.D. Mich. 2020).[18] Circulators in Michigan, including one of Esshaki's co-plaintiffs (Hawkins), were therefore not prevented from collecting signatures after Michigan's Stay-at-Home orders took effect. Hawkins did and was not arrested or punished for doing so. The orders made it harder, which was and is precisely the case in Ohio.

The panel also concluded, "without evidence," *see* Hasen, *supra*, that "sterilizing writing instruments between signatures" might be an effective measure to prevent the transmission of COVID. *Thompson*, 959 F.3d at 810. We know today that is not true. While surfaces can convey COVID, and wiping them down is wise, COVID is spread largely through aerosol. Standing anywhere near an infected person, even outside, while discussing the merits of a ballot initiative, was and remains a direct threat for the transmission of COVID. It was not until July of 2020 that this came to light and the CDC and government began requiring masks inside and outside. *See* Centers for Disease Control and Prevention, Press Release, *CDC calls on Americans to wear masks to prevent COVID-19 spread*, July 14, 2020.[19] Even then social distancing is required. The panel's premise that sterilizing pens is sufficient to prevent transmission of COVID has proved incorrect.

Professor Hasen thus rightly criticized the panel not only because it "did not explain how anything short of full exclusion of the plaintiffs from the ballot could count as merely a minor burden," Hasen, *supra*, but also because it "suggest[ed] without evidence that petition circulators

---

[18] This fact was reported by the District Court in *Esshaki* on May 20, 2020, two weeks after the Sixth Circuit panel in *Essahki* agreed the burden was severe. This might explain the *Thompson* panel's confusion over the facts.

[19] https://www.cdc.gov/media/releases/2020/p0714-americans-to-wear-masks.html.

would have an easier time collecting signatures in Ohio than in Michigan as the pandemic spread in both states." *Id.*

On September 16, 2020, after rejecting Plaintiffs' attempt to have the stay lifted in light of the continuing COVID crisis and the intervening decision in *SawariMedia*, the same panel that stayed this Court's preliminary injunction reversed it. *Thompson v. DeWine*, 976 F.3d 610 (6th Cir. 2020). It saw "no reason to depart from [its] previous holding that Ohio's ballot-access restrictions impose, at most, only an intermediate burden on [Petitioners'] First Amendment rights, even during COVID-19." *Id.* at 616.

**C.      Post-Stay Developments**

**1.      Ohio's COVID Restrictions**

As explained above, s*ee supra* at pages 6-11, since this Court's decision on May 9, 2020 and the Sixth Circuit's stay of that decision on May 26, 2020, Ohio has added to and replaced various executive orders barring public gatherings and requiring social distancing.  Ohio's most recent iteration of is emergency COVID orders is found in the Ohio Department of Health's April 8, 2021 order. It once again requires social distancing, bans gatherings, and requires that people wear masks. *See* Director's Order, Re: Director's Amended Order for Social Distancing, Facial Coverings and Non-Congregating, April 8, 2021.[20] In terms of gathering or "congregating" as it is now called, the most recent Order states:

> Individuals must avoid gathering in groups and attempt at all times to maintain social distancing. When gathered together, individuals should be in a group of no more than ten individuals that is separated from other groups by at least six feet.

---

[20] https://coronavirus.ohio.gov/static/publicorders/amended-directors-order-for-social-distancing-21.pdf.

*Id*. Ohio's continuing social distancing requirements, meanwhile, "include maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer …." *Id*.

Even in those gatherings that are allowed, the "[o]rganizers and managers [of the gathering] should conduct the event in a manner that discourages individuals from standing or sitting close together in buildings or on other parts of the grounds or premises …." *Id*. Seating, moreover, is limited to 25% of capacity. *Id*.[21]

While Governor DeWine and the Department of Health have altered the details of their COVID orders and restrictions numerous times this past year, the backbone of Ohio's (justifiable) COVID response has never changed. That backbone prohibits gatherings, requires distancing, and minimizes the risk of transmission. To this day in Ohio, regulations and restrictions remain in place to achieve all three aims. Consequently, people in Ohio are not free to congregate, sign petitions, or engage in the same daily activities as they were before the COVID crisis erupted in early 2020. Yet Ohio continues to demand strict compliance with its in-person petitioning requirements as if nothing has changed.

### 2.    Evidence Discovered Since the Stay

Although on May 26, 2020 when the stay was granted Americans knew COVID was dangerous, we did not know how debilitating and deadly the pandemic would be. We now know. Hundreds of thousands of Americans and tens of thousands of Ohioans have died from COVID. The extent to which Ohio's strict enforcement of its in-person petitioning requirements

---

[21]Ohio's latest Order attempts to carve out an exception under the First Amendment for "First Amendment Activity." *Id*. Left undefined, however, is what "First Amendment Activity" means outside the media context. Unlike its predecessors, which vaguely excepted only "First Amendment protected speech," the current exception reaches more broadly and even more vaguely.

contributed to this total is impossible to know, but compelling citizens to choose between the exercise of their First Amendment rights and their safety – and that of the public – is unacceptable. That is especially true given that Ohio could easily adopt the reasonable measures so many other states adopted, such as electronic petitioning procedures, that would enable citizens to exercise their First Amendment rights without placing themselves and the public at risk for contracting a deadly virus.

No statewide citizen initiatives in Ohio qualified for the November 2020 general election ballot.[22] At first blush this might be surprising for Ohio elections, since at least two citizen-initiatives (those presented by the Intervenors in this case) were making concerted attempts, and Ohio has averaged approximately two citizen initiated ballots each election since the advent of popular democracy in 1912. *See* T. DONOVAN, ET AL., STATE AND LOCAL POLITICS, INSTITUTIONS AND REFORM 119 (Figure 4.4) (4th ed. 2015). *See also* Scholars' Brief at 12 ("Due to generally high qualification thresholds, only a handful of statewide initiatives normally clear existing petitioning hurdles and reach the ballot in every two-year general election cycle."). But unlike in many sister States that relaxed their initiative requirements, Ohio's refusal to make any modification to its in-person petitioning requirements simply caused the inevitable. Without alterations to Ohio's wet, witnessed in-person signature collection requirements during this crisis, initiatives in Ohio do not have a realistic chance to qualify for the ballot in any but the smallest villages and townships.

A decrease in citizen initiatives was not limited to Ohio. Even after including data from those states that adopted reasonable modifications by reducing signature thresholds and allowing

---

[22] *See* NCSL National Conference of State Legislatures, Statewide Ballot Measures Database (Nov. 12, 2020), https://www.ncsl.org/research/elections-and-campaigns/ballot-measures-database.aspx.

remote collection, the overall number of statewide initiatives nationwide still fell by 50% in 2020 (as compared to 2018).[23]  This evidence makes clear that for popular democracy to remain viable (as the framers of Ohio's Constitution hoped it would), "States, like Ohio, should tailor their ballot qualifying requirements to the current public health and real world realities of conducting business, governmental and other activities, which will certainly continue as the pandemic eases." Scholars' Brief at 15.

The evidence in this case demonstrates that popular measures have utterly failed to make the ballot during the pandemic. Strict enforcement of Ohio's in-person petitioning requirements during the COVID pandemic have caused, and will continue to cause, the total or virtual exclusion of initiatives from Ohio's ballots in November 2021 and each future election cycle until the pandemic is over. This is not only a loss for those who favor Ohio's constitutionally created right to make use of the initiative, it is a loss for all Ohioans. After all, "[b]allot measures

---

[23]  *See* Amanda Zoch, *2020 Ballot Measures: A Preview*, National Conference of State Legislatures, Aug. 18, 2020, https://www.ncsl.org/research/elections-and-campaigns/2020-ballot-measures-a-preview-magazine2020.aspx (reporting that only 30 of "the Election Day measures [that] are citizen initiatives" are on statewide ballots as compared to "60 citizen initiatives in 2018 and 72 in 2016" and that this is "due in large part to COVID-19 and public safety measures that made in-person signature-gathering nearly impossible."); Amy Liu & Reniya Dinkins, *Report: It's not just Trump and Biden: State and local ballot measures could have a big impact on community recovery*, Brookings, Oct. 31, 2020, https://www.brookings.edu/research/its-not-just-trump-and-biden-state-and-local-ballot-measures-could-have-a-big-impact-on-community-recovery/ ("This year was unusual in that the total number of state ballot measures was significantly lower than in the past, potentially due to social distancing measures that limited citizens' capacity to organize and file them."); Gary A. Warner, *Pandemic leads to unusually short list of ballot measures*, The Bulletin, July 31, 2020, https://www.bendbulletin.com/localstate/state/pandemic-leads-to-unusually-short-list-of-ballot-measures/article_ae820da8-bd6f-11ea-87a2-5f833065356c.html ("The COVID-19 pandemic has made it difficult for traditional signature-gathering techniques such as stations at shopping centers and fairs, or going door to door. With Thursday's deadline to submit signatures, only one of the 72 ballot measures that have at some point submitted for review by the secretary of state made it across the finish line.").

drive political engagement and voter turnout," Scholars' Brief at 9, just as "[t]he initiative process provides more opportunities for political discourse and promotes a more engaged and informed electorate." *Id*. at 10.

### 3. Developments in the Sixth Circuit: *SawariMedia, LLC v. Whitmer*

Not long after the Sixth Circuit panel issued its stay in this case, a different panel of that Court rendered a diametrically opposed decision, finding that COVID's and Michigan's restrictions on initiative circulators were severe. *See SawariMedia, LLC v. Whitmer*, 963 F.3d 595, 597 (6th Cir. 2020). Like Ohio, Michigan shut-down the State on March 23, 2020 and then later included a formal exception for constitutionally protected activity. *See SawariMedia, LLC v. Whitmer*, 466 F. Supp.3d 758, 771 (E.D. Mich. 2020).[24] Circulators in Michigan, moreover, had time to collect signatures before those orders were adopted. *Id*. at 764 ("By early March, SawariMedia appeared to be well on its way to collecting a sufficient number of signatures"). Michigan's stay-at-home orders, meanwhile, went into effect and lasted "from March 23, 2020, through May 7, 2020" without any formal exception for First Amendment activities, *id*. at 770, thereby prohibiting collection for eight weeks.

On May 7, 2020, three weeks before the May 27, 2020 deadline, Michigan adopted formal "Constitutional Exemption Language" making clear that Michigan's stay-at-home orders did not "abridge protections guaranteed by the state or federal constitution *under these emergency circumstances.*" *Id*. at 771. Still, because the District Court concluded that "it is far from clear that that language [in the exception] permitted citizens to gather petition signatures," id., the exception "which was present only in the orders covering the last twenty days of the

---

[24] The *SawariMedia* district court decision was vacated by joint request of the parties on October 19, 2020. *SawariMedia LLC v. Whitmer*, 2020 WL 6580461, at *1 (E.D. Mich. 2020). That decision did not affect the Sixth Circuit's decision in *SawariMedia*, which is still published and remains as persuasive and controlling as the panel's interlocutory decisions in this case.

signature-collection period – did not meaningfully lessen the burden on Plaintiffs' First Amendment rights in the same manner or to the same extent as the exemptions in *Thompson*." *Id*.

Though it went to great lengths to distinguish the motions panel's stay in *Thompson*, the District Court's opinion in *SawariMedia* reveals that Michigan's experience with the COVID crisis, its emergency stay-at-home orders, its exception for constitutionally protected activities, the timeframes for collecting signatures supporting signatures, and the relevant opportunities to collect those signatures, were not in fact much different from that in Ohio. Circulators in both States had time before the crisis to collect signatures. Circulators in both States arguably (at great risk and uncertain as they were about legalities) had time after COVID struck and the stay-at-home orders were announced to collect more signatures. Initiative circulators in both States experienced several weeks following the initial adoption of emergency stay-at-home order when they were physically and legally prohibited from collecting signature; approximately 8 weeks in Michigan and 5 weeks in Ohio. *See* Verified Complaint, R.1, Page ID # 14 (Defendants admit that "it is literally impossible for people outside the same family unit to solicit others for signatures needed to support the initiative petitions needed to place initiatives and referenda on Ohio's November 2020 election ballot," and that "[g]athering in-person signatures in Ohio under the current circumstances is not only illegal under Ohio law but risks spreading COVID-19.").

Given the similarities between Michigan and Ohio, it is difficult to understand how Michigan's response to COVD could be deemed severe and Ohio's not. To the extent the *Thompson* panel concluded there were meaningful differences, Plaintiffs respectfully question whether they were correct or otherwise sufficient to justify such a disparate result. As explained above, *see supra* at 12, it appears that the *Thompson* motions panel was incorrect about Michigan

circulators' total inability to collect signatures after the announcement of the shut-down orders. A co-plaintiff in *Esshaki*, after all, collected over a thousand signatures after the State shut down. *See Esshaki v. Whitmer*, 461 F. Supp.3d 646, 648 (E.D. Mich. 2020). This distinction was then incorrectly applied by the *Thompson* panel to the facts in *SawariMedia*.

The reality is that circulators in Michigan could have collected signatures, just as Plaintiffs could have at great risk in Ohio. The impediments in both Michigan and Ohio were the COVID pandemic and the unavailability of anyone to sign. The cases are not different in any meaningful way. In the event, the new evidence presented here was not available to the Sixth Circuit in either *Esshaki*, *Thompson*, or *SawariMedia*. Coupled with the existing record these new developments and new evidence fully support enjoining Ohio's requirements that ciculators collect only wet, witnessed, in-person signatures by a specified date.

## **ARGUMENT**

### I.     Defendants' Rule 12(b) Motion to Dismiss Is Improper and Should Be Construed as a Motion for Judgment on the Pleadings Pursuant to Rule 12(c).

Defendants' motion to dismiss pursuant to Rule 12(b) is improper. Rule 12(b) motions must be filed before an answer or the time for pleading is closed. *See Sanders v. Wal-Mart Stores East*, 2018 WL 3190915, *9 (M.D. Ala. 2018) (stating that a Rule 12(b)(6) motion must be filed "before answering the complaints or at the close of pleadings"); *Stabile v. United Recovery Systems*, 2011 WL 5578981, *1 (E.D.N.Y. 2011) ("a Rule 12(b)(6) motion comes before the close of pleadings."). Here, as this Court previously recognized, "[t]he Answers for Defendants were due in May of 2020 and to date have not been filed." Order, R.61, at PAGEID # 793. Defendants therefore may not move for dismissal pursuant to Rule 12(b), and they have admitted the allegations in the Verified Complaint. *See Burlington N. R.R. Co.* v. *Huddleston*, 94 F.3d 1413, 1415 (10th Cir. 1996) ("By failing to submit an answer or other

pleading denying the factual allegations of Plaintiff's complaint, Defendant admitted those allegations, thus placing no further burden upon Plaintiff to prove its case factually.").

The proper mechanism for Defendants to assert lack of jurisdiction following the close of pleadings is Rule 12(c).  *See Costco Wholesale Corp. v. Hoen*, 2004 WL 7339619, *2 (W.D. Wash. 2004); *Martinez v. Regency Janitorial Services*, 2011 WL 4374458, *1 (E.D. Wis. 2011). This Court has discretion to treat an improperly filed Rule 12(b) motion in this fashion, and should do so here. *See*, *e.g*., *Williams v. Methodist Healthcare--Memphis Hospitals*, 2010 WL 11493261, *1 (W.D. Tenn. 2010). As with a Rule 12(b)(6) motion, Rule 12(c) assumes that the allegations of material fact in the complaint are true. *See Merchants Home Delivery Service Inc. Hall & Co., Inc.*, 50 F.3d 1487, 1488 (9th Cir. 1995).[25]

## II.     Defendants are Not Entitled to Judgment on the Pleadings.

### A.     The Case is Not Moot.

The Supreme Court has repeatedly recognized that elections are too short in duration to allow the litigation of constitutional challenges to election laws and procedures.  The Court has therefore carved out a "capable of repetition, yet evading review" exception to mootness for such cases. A long line of precedent supports this exception. *See, e.g., Moore v. Ogilvie*, 394 U.S. 814 (1969) (holding that election challenge was not moot because the controversy was capable of

---

[25] It is not clear, meanwhile, that Defendants may belatedly present an Eleventh Amendment defense that was not raised either under Rule 12(b) or in an Answer in a post-pleading motion (like Rule 12(c)). Unlike subject matter jurisdiction, an Eleventh Amendment defense can under certain circumstances be waived. *See Boler v. Earley*, 865 F.3d 391, 410 (6th Cir. 2017); *Doe v. DeWine*, 910 F.3d 842, 849 (6th Cir. 2018). Although the Eleventh Amendment has "a 'quasi-jurisdictional nature'," *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015) (citation omitted), its "jurisdictional component 'is not coextensive with the limitations on judicial power in Article III.'" *Id*. Although Plaintiffs formally object to Defendants' belated Eleventh Amendment defense here, the procedural problem need not be pressed, for Defendants' argument plainly lacks merit.

repetition yet evading review); *Norman v. Reed*, 502 U.S. 279 (1992) (same); *Meyer v. Grant*, 486 U.S. 414 (1988) (same); *Storer v. Brown*, 415 U.S. 724 (1974) (holding that an "as applied" challenge was not mooted by an election); *Democratic Party v. Wisconsin ex rel. La Follette*, 450 U.S. 107 (1981) (holding that an election challenge was not mooted by an intervening election); *Brown v. Chote*, 411 U.S. 452 (1973) (same); *Rosario v. Rockefeller*, 410 U.S. 752 (1973) (same).

The capable of repetition exception "applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Davis v. Federal Election Comm'n*, 554 U.S. 724, 735 (2008); *Graveline v. Benson*, 992 F.3d 524, 533 (6th Cir. 2021) (stating exception and finding it applied in election case notwithstanding passage of election). The fact that the challenge is directed at an election that has passed is of no moment, since this is always the case when the exception is invoked. *See*, *e.g.*, *Davis*, 554 U.S. 724  (resolving a dispute from the 2006 election two years later); *Anderson v. Celebrezze*, 460 U.S. 780, 784, & n. 3 (1983) (resolving a dispute from the 1980 election in 1983).

The exception applies equally to facial and as-applied challenges. *See Federal Election Commission v. Wisconsin Right to Life*, 551 U.S. 449, 463 (2007) ("We have recognized that the "'capable of repetition, yet evading review' doctrine, in the context of election cases, is appropriate when there are 'as applied' challenges as well as in the more typical case involving only facial attacks.").  It is for this reason that identical recurrences are not needed to support the exception:

> Requiring repetition of every 'legally relevant' characteristic of an as-applied challenge—down to the last detail—would effectively … mak[e] this exception unavailable for

virtually all as-applied challenges. History repeats itself, but not at the level of specificity demanded by the FEC.

*Id.*; *see also Graveline*, 992 F.3d at 533 (rejecting application of strict "same plaintiff" requirement to support exception).

So long as there is a reasonable expectation that a similar controversy will recur, an election challenge is not mooted by an intervening election. *See also Dunn v. Blumstein,* 405 U.S. 330, 333 n. 2 (1972) ("[a]lthough [the plaintiff] now can vote, the problem to voters posed by the Tennessee residence requirements is 'capable of repetition, yet evading review.'").

The Supreme Court recently made clear that the capable of repetition exception applies with special force to COVID restrictions. The reason is simple; they are emergency executive orders that come and go. One is frequently replaced by another. Using these fleeting changes to justify mootness would mean that the constitutional impacts of COVID restrictions would be immune from judicial scrutiny.

Thus, in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020) (per curiam order), a majority on the Court agreed that under circumstances like those presented here, with the New York Governor frequently changing COVID restrictions, the case was not rendered moot: "It is clear that this matter is not moot. *See Federal Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 462 (2007); *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000)." "[I]njunctive relief is still called for because the applicants remain under a constant threat that the area in question will be reclassified as red or orange. The Governor regularly changes the classification of particular areas without prior notice." 141 S. Ct. at 68 (citations omitted).

The Court reiterated in *Tandon*, 141 S. Ct. at 1297, that "even if the government withdraws or modifies a COVID restriction in the course of litigation, that does not necessarily

moot the case." Instead, "so long as a case is not moot, litigants otherwise entitled to emergency injunctive relief remain entitled to such relief where the applicants 'remain under a constant threat' that government officials will use their power to reinstate the challenged restrictions." *Id*. That a State's COVID restrictions prove temporary, are issued with promises of future rescission, and in fact have been rescinded, has not prevented the Supreme Court from addressing and enjoining them. As Justice Gorsuch said in *South Bay Pentecostal Church*, 141 S. Ct. at 720 (Gorsuch, J.), "[g]overnment actors have been moving the goalposts on pandemic-related sacrifices for months, adopting new benchmarks that always seem to put restoration of liberty just around the corner."

The Sixth Circuit, for its part, has routinely applied the capable of repetition exception in election cases, with never a mention of Defendants' novel Eleventh Amendment argument. The Sixth Circuit in *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 584 (6th Cir. 2006), observed that that the too-short-in-duration requirement "is easily satisfied" in election challenges. "Legal disputes involving election laws almost always take more time to resolve than the election cycle permits." *Id*. (citations omitted). "In the present case, less than eleven months elapsed between the filing of the lawsuit and the occurrence of the election, and future challenges will face the same problem." *Id*.

In terms of the likely-to-recur prong, the Sixth Circuit found in *Blackwell*, 462 F.3d at 584-85, that it "is likely that the LPO will once again seek to place candidates on the general election ballot in 2008." "As a result, the party again will face the requirements that its candidates" were then challenging. *Id*. at 585. "Considering the 'somewhat relaxed' repetition standard employed in election cases, this issue easily satisfies the 'capable of repetition, yet evading review' exception and is not moot." *Id*. (citations omitted). *See also Libertarian Party of*

*Ohio v. Husted*, 831 F.3d 382, 394 (6th Cir. 2016) (finding that an as-applied, selective enforcement problem could possibly recur and was not mooted by the election: "the purpose of the second prong [of the capable-of-repetition exception] is to determine 'whether the controversy was *capable* of repetition and not ... whether the claimant had demonstrated that a recurrence of the dispute was more probable than not.").

Defendants' claim that Plaintiffs could have foregone Supreme Court review in favor of completing the litigation and winning relief in this Court before the November 3, 2020 election is far-fetched to say the least. Ohio law required that final, official ballots be certified for the November 3, 2020 election by September 14, 2020.  *See* Ohio 2020 Elections Calendar (citing § 735.11 of H.B. 166 (133rd G.A.)). These ballots were then due to be sent to overseas voters on September 18, 2020.  Ohio 2020 Elections Calendar (citing O.R.C. §§ 3511.04, 3511.16). The Sixth Circuit released its decision reversing this Court's preliminary injunction on September 16, 2020, two days after the ballots were printed.  Its mandate returning the case to this Court was not issued until October 8, 2020, *see* Sixth Circuit Doc. No. 107, long after the printers had cooled and just three weeks prior to the election. Even assuming that overseas voters don't count, how Plaintiffs could remotely collect sufficient signatures in 73 cities, have them verified and then have ballots across the state reprinted in this three-week period boggles the imagination.

As for the second prong of the capable of repetition inquiry, Plaintiffs here continue to actively attempt to qualify their initiatives for local ballots.  *See* Declaration of Chad Thompson (Attachment 1). The Ohio laws being challenged requiring in-person collection, an early deadline, and unadjusted numbers, remain the same. COVID has not presented a temporary emergency; it is a full-blown crisis in the second year of its indefinite duration. *See South Bay Pentecostal Church*, 141 S. Ct. at 720 (Gorsuch, J.) ("As this crisis enters its second year ... it is

too late for the State to defend extreme measures with claims of temporary exigency, if it ever

could."). There is not only a likelihood of recurrence, there is recurrence here.  The capable of

repetition yet evading review exception plainly applies.

       **B.**     **Defendants Are Not Protected by the Eleventh Amendment.**

      Defendants argue that Plaintiffs' case must be dismissed under the Eleventh Amendment.

Their thesis is that Plaintiffs can only seek to retroactively have their initiatives placed on the

November 2020 election ballot. Because this relief is retroactive, they claim, the Eleventh

Amendment requires dismissal.

      Defendants' surmise is incorrect. Plaintiffs do not seek to have their initiatives

retroactively placed on the November 2020 election ballot. Instead, as stated in the Complaint,

and as previously ordered by the District Court, they seek a forward-looking injunction against

Defendants:

> (i) prohibiting enforcement of Ohio's in-person supporting signature requirements for
> candidates for office for Ohio's November 3, 2020 general election; (ii) extending the
> deadline for submitting supporting signatures to city auditors, village clerks and local
> election boards of elections in order to qualify popular measures for local November 3,
> 2020 election ballots to September 1, 2020; (iii) directing Defendants to develop at their
> expense timely, efficient and realistic procedures and practices for gathering supporting
> signatures from voters and submitting them to local officials ….

Complaint, R.1, at PAGEID # 18.

      Plaintiffs further seek "a declaratory judgment against Defendants stating that, in light of

the current public health emergency caused by the COVID-19 pandemic and executive orders

requiring that Ohio citizens stay at home and shelter in place, Ohio's supporting in-person

signature requirements and submission deadlines for popular measures proposed for local

November 3, 2020 elections in Ohio violate the First and Fourteenth Amendments to the United

States Constitution."  *Id.*

Because the initial Complaint was designed to win this relief in preliminary and permanent fashion in time for the November 3, 2020 general election, that election date is included in Plaintiffs' demand for relief. This does not mean, however, that prospective relief is now foreclosed. On the contrary, as Rule 54(c) expressly states, a "final judgment should grant the relief to which either party is entitled, even if the party has not demanded that relief in its pleadings." *See Frank v. Walker*, 819 F.3d 384, 388 (7th Cir. 2016); *Pension Ben. Guar. Corp. v. East Dayton Tool and Die*, 14 F. 3d 1122, 1127 (6th Cir. 1994); *Morrow v. South*, 540 F. Supp. 1104, 1111 (S.D. Ohio 1982). Should Plaintiffs prevail here, therefore, they are entitled to prospective relief as necessary to enable their participation in the current election cycle.

Defendants have not cited a single case that supports their novel Eleventh Amendment argument, and to the best of Plaintiffs' knowledge no such case exists. As the Court explained in *Storer*, 415 U.S. at 737 n.8, the whole reason for the capable of repetition exception is that it saves judicial time in the context of future elections:

> The 1972 election is long over, and no effective relief can be provided to the candidates or voters, but this case is not moot, since the issues properly presented, and their effects on independent candidacies, will persist as the California <u>statutes are applied in future elections</u>. … The construction of the statute, an understanding of its operation, and possible constitutional limits on its application, <u>will have the effect of simplifying future challenges</u>, thus increasing the likelihood that timely filed cases can be adjudicated before an election is held.

(Emphasis added). That is exactly why the capable of repetition is needed here. If Defendants are correct, Plaintiffs' case must be dismissed and they must start all over again to make the exact same challenge to the next election. After that, their case will be moot again and they would have to start anew once again. The Supreme Court has made clear that this is inefficient, unnecessary, and obviated by the capable of repetition exception to mootness. *See id.*

### III. Plaintiffs Are Entitled to Judgment on the Pleadings Under Rule 12(c).

#### A. The Interlocutory Decisions in This Case Are Not Binding.

Defendants fail to acknowledge a critical point that undermines their entire position: the panel's interlocutory dispositions of this case are not controlling. A grant or denial of preliminary relief is not a final decision on the merits, has no res judicata or collateral estoppel effect, and does not constitute the law of the case. *See City of Angoon v. Hodel,* 803 F.2d 1016, 1024 n. 4 (9th Cir. 1986) (holding that determinations corresponding to a preliminary injunction do not constitute the law of the case); *Technical Publishing Co. v. Lebhar–Friedman, Inc.,* 729 F.2d 1136, 1139 (7th Cir.1984) ("A factual finding made in connection with a preliminary injunction is not binding"). For this reason, "a motions panel's legal analysis, performed during the course of deciding an emergency motion for a stay, is not binding on later merits panels." *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1079 (9th Cir. 2020).

The Supreme Court in *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981), explained why this is so:

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing, and <u>the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits</u>.

(Emphasis added).

The Sixth Circuit has made clear that just as the findings of fact and conclusions of law rendered to support a preliminary injunction are not binding, findings of fact and conclusions of law rendered to deny a preliminary injunction are not binding either. "Rulings that simply deny

extraordinary relief for want of a clear and strong showing on the merits, or that are avowedly preliminary or tentative, do not trigger law of the case consequences." *Wilcox v. United States*, 888 F.2d 1111, 1113 (6th Cir. 1989) (citations omitted).

This same logic applies to interlocutory reversals of preliminary injunctions. In *Golden State Transit Corp. v. City of Los Angeles,* 754 F.2d 830 (9th Cir. 1985), *rev'd on other grounds,* 475 U.S. 608 (1986), for example, a subsequent appellant panel refused to follow a prior motions panel's reversal of a preliminary injunction: "The City argues that our prior decision on the preliminary injunction is law of the case and reconsideration of it is barred. This assertion is wrong. As a general rule, decisions on preliminary injunctions do not constitute law of the case and 'parties are free to litigate the merits.'" *Id*. at 832 n.3.

The same is true of interlocutory stays. In *Wilcox*, 888 F.2d 1111, the Court stated:

> As a general rule, decisions on preliminary injunctions do not constitute law of the case and 'parties are free to litigate the merits.' "<u>Refusal to stay a preliminary injunction pending appeal does not establish the law of the case since it rests on nothing more than a tentative appraisal of the probable result on the merits.</u>"

*Id*. at 1114 (citations omitted and emphasis added).  The same holds for stays of preliminary injunctions. "'[I]n deciding whether the court should stay the grant or denial of a preliminary injunction pending appeal, the motions panel is *predicting* the likelihood of success of the appeal.'" *East Bay Sanctuary Covenant v. Garland*, 2020 WL 9156716, *18 (9th Cir., April 8, 2021) (citation omitted). Under these circumstances, "[t]he motions panel's decision is not binding." *Id*.

Because grants and denials of stays, like grants, denials and reversals of preliminary injunctions, are merely predictive and reflect only the preliminary equities of a case, they (and their supporting rationales) are not binding. Neither the *Thompson* motion panel's stay nor its

interlocutory reversal are binding on this Court. Instead, the Court is free to render both factual findings and legal conclusions de novo.

Denials of interlocutory certiorari are not binding precedent either: they do not reflect approval of the appealed decision's result nor do they bar another attempt at certiorari review. As explained by Justice Scalia in *Virginia Military Institute v. United States*, 508 U.S. 946, 946 (1993) (Scalia, J., concurring in denial of certiorari), the Supreme Court may grant interlocutory certiorari, but its failure to do so does not prejudice the right of the petitioner to try again following final judgment:

> We generally await final judgment in the lower courts before exercising our certiorari jurisdiction. I think it prudent to take that course here. Our action does not, of course, preclude VMI from raising the same issues in a later petition, after final judgment has been rendered.

The Supreme Court thereafter took the case on certiorari following final judgment in and rendered an historic decision.  *See United States v. Virginia*, 516 U.S. 910 (1995); *see also Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010) (accepting review following final judgment after refusing interlocutory appeal).

Accordingly, Plaintiffs are free to press their claims to a final judgment on the merits, and this Court is free to rule on those claims *de novo*, as warranted by the evidence now in the record.

**B.     The Evidence Now in the Record Establishes That Plaintiffs Are Entitled to Relief  Under the Motions Panel's "Exclusion or Virtual Exclusion" Standard.**

This case stands in stark contrast to the case as it existed when the preliminary proceedings were litigated.[26]  The record now includes undisputed facts that establish Plaintiffs'

---

[26] Plaintiffs' First Amendment argument was previously briefed on April 27, 2020 in support of their Motion for Preliminary Injunction.  *See* R.4-1. Plaintiffs incorporate that legal argument into this Rule 12(c) Motion by reference.

entitlement to relief, even under the singular "exclusion or virtual exclusion" standard that the motions panel adopted.

First, and most important, Ohio's strict enforcement of its in-person petitioning requirements has in fact resulted in the total or virtual exclusion of initiatives from Ohio's statewide and local ballots. No statewide initiatives appeared on Ohio's November 2020 general election ballot, and Plaintiffs succeeded in placing only 4 out of the 73 initiatives they reasonably anticipated placing on local ballots[27] – and these rare exceptions appeared exclusively in small villages with correspondingly low signature requirements.

Second, science has learned that COVID is airborne and primarily transmitted through aerosol.  Contrary to the motions panel's assumption when it issued its stay, *see Thompson*, 959 F.3d at 810, the use of sanitizer on surfaces (like pens and tables) is not an effective means of preventing transmission of the virus between petition circulators and signers.   Far more important than avoiding contaminated surfaces is avoiding infected people, whose mere presence and breathing spreads the disease – even when they exhibit no symptoms. The activity of gathering signatures in person, from large numbers of strangers day after day, thus poses unacceptable risks to the health and well-being not only of circulators and signers, but all citizens through community spread.

Third, contrary to Ohio's representation to the motions panel, Ohio has never "opened up." *See supra* at pages 7-11. Instead, Ohio shut down even further than it had been.  Ohio still bans gatherings of more than ten people, and social distancing is still mandated. *See* Ben Axelrod, *Ohio lifts COVID-19 curfew effective Thursday; ends last call restrictions*, WKYC,

---

[27] Plaintiffs are experienced at placing their marijuana decriminalization initiatives on local ballots, *see Schmitt v. LaRose*, 933 F.3d 628 (6th Cir. 2019), and reasonably understand what may and may not be accomplished in any given election cycle.

Feb. 11, 2021.[28] And people are now required to wear masks. Furthermore, from November 19, 2021 to February 11, 2021, Ohioans were even living under a curfew.

Fourth, COVID is not only deadly, but continues to spread and kill at an alarming rate. As of April 29, 2021, 571,297 Americans have died from COVID. *See* Centers for Disease Control and Prevention, Covid-19, April 29, 2021.[29] That figure includes 19,188 Ohioans. *See* Ohio Department of Health, COVID-19 Dashboard, April 29, 2021.[30] And those numbers keep rising, with no clear end in sight. According to the Centers for Disease Control and Prevention, as of April 29, 2021 there have been 32 million COVID cases in the United States, with the number increasing at a steady rate. Centers for Disease Control, *supra*.

Fifth, Defendants have now admitted that collecting signatures at the start of the COVID crisis in March 2020 and for six weeks thereafter until April 30, 2020 (when Ohio added an express exception for circulators) was both physically impossible and illegal under Ohio's emergency orders. Neither admission was available to the Sixth Circuit on May 26, 2020 when it concluded that Ohio's "First Amendment protected speech" exception allowed circulation during the first weeks of the COVID crisis.

Taken together, the foregoing facts demonstrate that Ohio's strict enforcement of its in-person petitioning procedures has resulted and will continue to result in "the exclusion or virtual exclusion" of initiatives from Ohio's ballot. *Thompson*, 959 F.3d at 808. It did so in 2020. That is now a matter of historical fact. Furthermore, whatever the record may have disclosed in May 2020, when the motions panel stayed this Court's preliminary injunction, it is now also a matter

---

[28] https://www.wkyc.com/article/news/health/coronavirus/ohio-covid-19-curfew-midnight/95-754a8fe7-41c5-48fe-9a8b-b311ecbd7329.

[29] https://www.cdc.gov/coronavirus/2019-ncov/index.html.

[30] https://coronavirus.ohio.gov/wps/portal/gov/covid-19/dashboards/overview.

of historical fact that Ohio is not "beginning to lift their stay-at-home restrictions," *id.* at 810 – not, at least, in any meaningful sense that would enable Plaintiffs to resume their petitioning efforts in a lawful and safe manner.  The impediments that prevented Plaintiffs from placing initiatives on Ohio's statewide and local ballots in 2020 – both legal restrictions and threats to individual and public health – thus continue to burden Plaintiffs and will prevent them from placing initiatives on the ballot in 2021.

Consequently, if it were not clear in May of 2020, the undisputed facts in the record now demonstrate that Ohio's strict enforcement of its in-person petitioning procedures imposes severe burdens on Plaintiffs' First Amendment rights.  *See id.* at 808 ("The hallmark of a severe burden is exclusion or virtual exclusion from the ballot.") (citation omitted).  Yet, while Ohio has adopted reasonable modifications to certain election laws in response to the COVID pandemic – for example, it postponed its 2020 primary election – Ohio continues to demand strict compliance with its in-person petitioning procedures. *See id.* at 807.  Ohio still requires that circulators collect "wet" signatures in-person and witness them. The numbers of signatures required remains the same, as do the deadlines and temporal limitations. Unlike just about every other facet of life in Ohio, including shopping, litigating, voting, and entertaining, with popular democracy Ohio has acted like COVID never happened.

When a plaintiff's "rights are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance." *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 586 (6th Cir. 2006) (citation and quotation marks omitted). In such cases, a state may not rely upon "generalized and hypothetical interests identified in other cases" to justify the burdens that its regulations impose, but rather must demonstrate with specificity that the regulations are necessary to further its compelling interests. *Id.*, at 593-95. In light of the

evidence now available from the 2020 election cycle, Ohio cannot make such a showing. It cannot demonstrate that strict enforcement of its in-person petitioning requirements is necessary in the context of the COVID pandemic.

In 2020, many other states adopted reasonable modifications to their petitioning requirements to alleviate the burdens they imposed as applied in the extraordinary circumstances presented by the pandemic. *See* Scholars' Brief at 15.  Such modifications typically took the form of reduced signature requirements, extended filing deadlines, suspended witness and notarization requirements, and the adoption of electronic petitioning procedures, among others. *See*, *e.g.*, *Libertarian Party of Il. v. Pritzker*, 455 F.Supp.3d 738 (N.D. Ill. 2020) (reducing signature requirement by 90 percent, extending filing deadline, enjoining notarization requirement and authorizing electronic petitioning procedures), *aff'd*, *Libertarian Party of Il. v. Cadigan*, 2020 WL 5104251 (7th Cir. Aug. 20, 2020); *Green Party of Md. v. Hogan*, No. 1:20-cv-1253 (D. Md. June 19, 2020) (reducing signature requirement by 50 percent and authorizing electronic petitioning procedures); *Goldstein v. Sec. of the Commonwealth*, 142 N.E. 3d 560 (Mass. 2020) (reducing signature requirement by 50 percent and authorizing electronic petitioning procedures). None of these states reported significant problems with fraud prevention or the verification of signatures in a timely and orderly fashion (the interests asserted by Defendants here), nor with any other aspect of the administration of their elections.

Ohio, by contrast, has been "unbending" in its enforcement of its in-person petitioning requirements.  *See Thompson*, 959 F.3d at 806.  But as the Supreme Court has emphasized:

> [E]ven when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty,  and we have required that States adopt the least drastic means to achieve their ends. This requirement is particularly important where restrictions on access to the ballot are involved.

*Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 185 (1979) (citations and quotation marks omitted). Here, Ohio cannot show that strict enforcement of its in-person petitioning requirements during the COVID pandemic is "the least drastic means" to protect its regulatory interests – not when numerous other states have demonstrated that less burdensome alternatives are available. Consequently, Plaintiffs are entitled to relief, even under the exclusion or virtual exclusion standard that the motions panel adopted in this case.

C. **Plaintiffs Are Entitled to Relief Under Established Sixth Circuit and Supreme Court Precedent, Including Related Actions Arising Under the COVID Pandemic.**

Plaintiffs are also entitled to relief under long-standing Sixth Circuit and Supreme Court precedent applying the *Anderson-Burdick* analysis. Under that analysis, "exclusion or virtual exclusion from the ballot" may be "the hallmark of a severe burden," *Thompson*, 959 F.3d at 808 (citation omitted), but it is not a prerequisite to the finding of a severe burden. As the Supreme Court has plainly stated, there is no "litmus test for measuring the severity of a burden that a state law imposes." *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 191 (2008). Consequently, exclusion or virtual exclusion from the ballot is a *sufficient* condition for finding a severe burden under the Sixth Circuit precedent cited by the motions panel, but it is not a *necessary* condition. Otherwise, such precedent would run afoul not only of *Crawford*, but also *Anderson* and *Storer*, both of which reaffirm that lower courts must not apply litmus tests to "separate valid from invalid restrictions." *Anderson*, 460 U.S. at 789 (quoting *Storer*, 415 U.S. at 730).

In *Anderson*, for instance, independent candidates were not excluded or virtually excluded from Ohio's ballot – on the contrary, as the Court expressly acknowledged, "[f]ive individuals were able to qualify as independent Presidential candidates in Ohio in 1980."

*Anderson*, 460 U.S. at 792 n.12.  The Court nonetheless found that Ohio's restrictions on John Anderson's independent candidacy in that same year were severe.  *See id.* at 792-93.  Anderson challenged Ohio's March filing deadline—a mere "limit" on ballot access—yet the Court struck it down.  It did so because "not only" did it "totally exclude" any candidate who decided to run after the March deadline, but because "[i]t also burdens the signature-gathering efforts of independents who decide to run in time to meet the deadline." *Id.* at 792.  Either exclusion of candidates who decided to run after March, or a burden on the signature-gathering efforts of those who decided to run before then was sufficient to establish a severe burden.  But neither was necessary.

Thus, while Plaintiffs are entitled to relief based on the undisputed facts demonstrating that Ohio's strict enforcement of its in-person petitioning requirements has caused the exclusion or virtual exclusion of initiatives from Ohio's ballots, *see supra* at 17-18, they are also entitled to relief under the well-settled precedent recognizing that "[i]n some circumstances, the 'combined effect' of ballot-access restrictions can pose a severe burden." *Libertarian Party of Kentucky v. Grimes*, 835 F.3d 570, 575 (6th Cir. 2016). In *Green Party of Tennessee v. Hargett*, 791 F.3d 684, 694 (6th Cir. 2015), for example, the Sixth Circuit deemed "severe" a requirement that recognized minor parties "obtain 5% of the total number of votes cast for gubernatorial candidates in the last gubernatorial election" because "established major parties were given four years to obtain the same level of electoral access."  Although the state did not totally or virtually deny ballot access to minor parties, the Court concluded that the challenged restriction imposed a severe burden.  *See also Libertarian Party of Ohio*, 462 F.3d 579 (holding that a combination of Ohio laws regulating early-filing and the number of signatures was a severe burden on a minor party).

37

As *Green Party of Tennessee* and *Libertarian Party of Ohio* demonstrate, the severity of the burden on a plaintiffs' constitutional rights must be determined not based upon any categorical litmus test, but rather based upon a "practical assessment of the challenged scheme's justifications and effects." *Storer*, 415 U.S. at 730; *see generally Arizona Green Party v. Reagan*, 838 F.3d 983, 990 (9th Cir. 2016) ("the Supreme Court and our sister circuits have emphasized the need for context-specific analysis in ballot access cases") (citations omitted).  Here, such an assessment demonstrates that the burden on Plaintiffs' rights is severe and warrants relief.  The Sixth Circuit's decisions in related actions arising under the COVID pandemic bolster that conclusion.

 For example, in *Esshaki v. Whitmer*, 813 Fed. Appx. 170, 171 (6th Cir. 2020), *affirming in part* 455 F. Supp.3d 367 (E.D. Mich. 2020), the Sixth Circuit held that the combined effect of a "State's strict enforcement of ballot-access provisions and [its] Stay-at-Home Orders impose[s] a severe burden on the plaintiffs' ballot access, so strict scrutiny applie[s]."  In *Esshaki*, 455 F. Supp.3d at 372, Michigan's Governor had issued two executive orders on March 23 and April 9, 2020 that were virtually identical to those issued in Ohio at the same time. Notwithstanding the COVID crisis and the State's Stay-at-Home Orders, Esshaki had registered as a candidate on October 31, 2019 and by March 23, 2020 "already collected approximately seven hundred signatures."  *Id.* at 371. He needed only three hundred more to qualify when the first Stay-at-Home Order was announced. *Id.* at 370.

Michigan, like Ohio, "insist[ed] on enforcing the signature-gathering requirements as if its Stay-at-Home Order … had no impact on the rights of candidates and the people who may wish to vote for them." *Id*. at 370. Michigan also argued precisely what Ohio argues here, that circulators should have braved the crisis and gathered signatures.  The District Court disagreed.

It rejected Michigan's argument as "both def[ying] good sense and fl[ying] in the face of all other guidance that the State was offering to citizens at the time." *Id.* at 375. "[P]rudence at that time counseled in favor of doing just the opposite." *Id.* Applying *Anderson-Burdick*, the District Court found a severe burden and applied strict scrutiny to conclude that an injunction was warranted. *Id.* at 377 ("[T]his Court has little trouble concluding that the unprecedented— though understandably necessary—restrictions imposed on daily life by the Stay-at-Home Order, when combined with the ballot access requirements … have created a severe burden on Plaintiff's exercise of his free speech and free association rights under the First Amendment ….") (emphasis added).

> The Sixth Circuit refused to stay the District Court's preliminary judgment:

> <u>The district court correctly determined that the combination of the State's strict enforcement of the ballot-access provisions and the Stay-at-Home Orders imposed a severe burden on the plaintiffs' ballot access</u>, so strict scrutiny applied, and even assuming that the State's interest (i.e., ensuring each candidate has a reasonable amount of support) is compelling, the provisions are not narrowly tailored to the *present circumstances*.

813 F. App'x at 171 (emphasis added). The Court accordingly affirmed "the district court's order enjoin[ing] the State from enforcing the ballot-access provisions at issue unless the State provides some reasonable accommodations to aggrieved candidates." *Id.* Notably, neither the district court nor the Sixth Circuit applied an "exclusion or virtual exclusion" test to reach its conclusion.

The Sixth Circuit reached a similar result in *SawariMedia LLC v. Whitmer*, 963 F.3d 595 (6th Cir. 2020), on July 2, 2020 (several weeks after the *Thompson* motions panel's stay was put in place). There, Michigan (like Ohio) had fully implemented emergency Stay-at-Home orders by March 23, 2020. Initiative circulators in Michigan, just like in Ohio, accordingly sued seeking relief from Michigan's in-person petitioning requirements and filing deadline.

SawariMedia had filed its initiative and begun collecting signatures on January 16, 2020. 466 F. Supp.3d at 764. It was, according to the District Court, "well on its way to collecting a sufficient number of signatures to place its initiative on the November 2020 general election ballot," *id.* at 764, when the COVID crisis erupted and the shutdown began. By April of 2020, in an effort to allow circulators to gather the additional needed signatures, Michigan announced that "[p]ersons may engage in expressive activities protected by the First Amendment." *See* Michigan Executive Order 2020-42 FAQs, https://www.michigan.gov/coronavirus/0,9753,7-406-98178_98455-525278--,00.html. On May 7, 2020 Michigan included this constitutional rights exception in an emergency order.[31] SawariMedia thus had three more weeks to collect signatures under the protection of this formal exception and meet the State's May 27, 2020 deadline.

Notwithstanding the fact that SawariMedia's circulators had several weeks to collect signatures before the State's stay-at-home orders took effect, and that SawariMedia's circulators had several weeks to continue collecting following Michigan's May 7, 2020 adoption of a constitutional rights exception, the District Court concluded that they were still severely burdened, just as the plaintiffs were in *Esshaki*. "[T]he Plaintiffs faced a daunting signature requirement with a firm deadline in the midst of the COVID-19 pandemic." *Id.* at 770.

The Sixth Circuit declined to stay the District Court's decision. *SawariMedia, LLC v. Whitmer*, 963 F.3d 595 (6th Cir. 2020). It relied on *Esshaki v. Whitmer*, 813 Fed. Appx. 170 (6th Cir. 2020), to support this result. That case made clear that the combined effects of COVID, Michigan's stay-at-home orders and its in-person signature requirements placed a severe burden on First Amendment rights. Notably, once again, neither the District Court nor the Sixth Circuit

---

[31]  "The Constitutional Exemption Language provided that the restrictions imposed by the Governor did not 'abridge protections guaranteed by the state or federal constitution under these emergency circumstances.'" *SawariMedia*, 466 F. Supp.3d at 771 (emphasis and footnote omitted).

in *SawariMedia* required "exclusion or virtual exclusion" from the ballot. Furthermore, Michigan's adoption of a constitutional rights exception changed nothing.

There is no valid basis for distinguishing *Esshaki* and *SawariMedia* from this case. In *Esshaki*, for instance, the lead plaintiff, like Plaintiffs here, had gathered a number of signatures (approximately 700) before Michigan imposed its Stay-at-Home Order, and he had notice that he could continue to collect signatures in April under the State's informal exception for First Amendment rights. Indeed, a co-plaintiff (Hawkins) of Esshaki's who had collected 3000 signatures before the first Stay-at-Home Order collected an additional 1283 signatures after that Order went into place and was thereby able to qualify before April 21, 2020. *Essahki v. Whitmer*, 461 F. Supp.3d 646, 648 (E.D. Mich. 2020). Thus, the record in *Esshaki* contradicts the conclusion that the plaintiffs were excluded or virtually excluded from the ballot during the petitioning period. One plaintiff succeeded in submitting enough signatures for the ballot, and the other had an opportunity to do so, albeit under more difficult circumstances. Neither the District Court nor the Sixth Circuit made a finding or drew a conclusion to the contrary.

The same is true of *SawariMedia*. By the time that case was litigated, Michigan had adopted a formal exception for constitutional (including First Amendment) rights. Furthermore, the District Court's factual findings establish that petition circulators in *SawariMedia* were not prevented from collecting signatures for the entire statutory petitioning period. (Their collection period began on January 16, 2020 and ended on May 27, 2020. *See SawariMedia, LLC v. Whitmer*, 466 F. Supp.3d 758, 770 (E.D. Mich. 2020). Rather, they had time to collect signatures both before the stay-at-home orders were announced and after they were announced, under both the State's initial executive order issued in April 2020 (which Harris relied upon in *Esshaki*) and its May 7, 2020 emergency order excepting constitutional rights.

Not only are *Esshaki* and *SawariMedia* materially indistinguishable from this case, but also, the severity of the burdens imposed in those cases was less onerous than the burdens imposed on Plaintiffs here. In *SawariMedia* the circulators only needed to meet an 8 percent signature requirement, as opposed to Ohio's 10 percent signature requirement here, and they also had several weeks to collect signatures unimpeded by the State's Stay-at-Home orders. By way of contrast, the *Thompson* circulators began collecting on February 27, 2020, in the opening days of the COVID crisis. They had no time on the front end, as the circulators did in both *Esshaki* and *SawariMedia*. The *Thompson* circulators' collection period was completely covered by COVID.

Both *Esshaki* and *SawariMedia* stand for the proposition that the "combined effects" of the COVID crisis, stay-at-home orders, and in-person petitioning requirements imposed severe burdens on the plaintiffs, warranting relief under the *Anderson-Burdick* analysis. Accordingly, just as the plaintiffs in those cases were granted relief, Plaintiffs here are also entitled to such relief. Any conclusion to the contrary would be inconsistent with Sixth Circuit and Supreme Court precedent.

\* \* \*

The near-total exclusion of initiatives from Ohio's ballots in 2020 harmed the First Amendment rights of Ohioans throughout the state. It will continue to do so in the absence of judicial relief. "The State of Ohio's Emergency Order—prohibiting large-scale events and directing social distancing—makes collecting voters' ink signatures extremely difficult. As a result, initiative proposals that could have qualified in non-pandemic times may not reach the ballot today." Scholars' Brief at 3. As Justice Gorsuch recently observed, "[e]ven if the Constitution has taken a holiday during this pandemic, it cannot become a sabbatical." *Roman*

*Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 69 (2020) (Gorsuch, J., concurring).  The majority in that case agreed.  *See id.* (holding that "enforcement of the Governor's severe restrictions" on plaintiffs' First Amendment activities "must be enjoined.").  This Court should grant Plaintiffs the relief to which they are entitled under Sixth Circuit and Supreme Court precedent.

## CONCLUSION

Plaintiffs respectfully request the Court for declaratory judgment and move the Court to (1) prohibiting enforcement of Ohio's in-person supporting signature requirements for candidates for office during the ongoing COVID crisis, (2) extend the deadline for submitting supporting signatures to city auditors, village clerks and local election boards of elections in order to qualify popular measures for local election ballots during the ongoing COVID crisis, and (3) enjoining the required number of signatures required in order to place initiatives on local election ballots during the ongoing COVID crisis.  As it did with the preliminary injunction, the Court should also order Defendants to develop with Plaintiffs a timely, efficient and realistic procedure for gathering supporting signatures from voters and submitting them to local officials

Respectfully submitted,

*/s/ Mark R. Brown*

OLIVER B. HALL
CENTER FOR COMPETITIVE DEMOCRACY
P.O. Box 21090
Washington, D.C. 20009
(202) 248-9294
oliverhall@competitivedemocracy.org
*Attorneys for Plaintiffs*

MARK R. BROWN
303 East Broad Street
Columbus, OH 43215
(614) 236-6590
(614) 236-6956 (fax)
mbrown@law.capital.edu